James C. WRIGHT, Jerry Lee Pena, Roberto Pablo Salas, Michael S. Guile, Louis X. Richardson, Roberto Frias, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Jiro J. ENOMOTO, Director of the Department of Corrections of the State of California, W. T. Stone, Superintendent of the California Training Facility at Soledad, Jacob Gunn, Warden of the California State Prison at Folsom, Robert Rees, Warden of the California State Prison at San Quentin, and L. N. Patterson, Superintendent of the Deuel Vocational Institution, Defendants.

No. C–73–1422 SAW.

United States District Court,
N. D. California.

Sept. 30, 1976.

Judgment Affirmed Feb. 21, 1978. See 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756.

B. E. Bergesen, III, Sidney M. Wolinsky, Vilma S. Martinez, Sanford J. Rosen, Mexican-American Legal Defense & Education Fund, William Bennett Turner, NAACP Legal Defense & Education Fund, Bernard Zimmerman, San Francisco, Cal., James F. Smith, Legal Aid Society of Sacramento County, Sacramento, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen. of the State of California, Jerome C. Utz, C. Michael Buzzell, Deputy Attys. Gen., San Francisco, Cal., for defendants.

Before DUNIWAY, Circuit Judge, and WOLLENBERG and WEIGEL, District Judges.[*]

WEIGEL, District Judge.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

This action was brought by plaintiffs on behalf of themselves and the class of all male prisoners confined or subject to confinement in maximum security at four State of California prisons located, respectively, at San Quentin, Folsom, Soledad and Tracy. Defendants are the wardens of the prisons and the director of the Department of Corrections.[1] The class, certified on February 25, 1976, is divided into three subclasses: (1) All prisoners confined and/or subject to being confined in maximum security units at the four institutions as a result of disciplinary procedures; (2) all prisoners so confined who have knowingly and voluntarily requested confinement in such units; and (3) all prisoners confined in such units or subject to being so confined who are not included in sub-class (1) or (2). This last sub-class includes those confined for so-called "administrative" reasons.

The complaint alleges two causes of action. The first challenges the procedures resulting in confinement of inmates in maximum security units for "administrative"

---

[*] Honorable Ben C. Duniway, United States Circuit Judge for the Ninth Circuit, Honorable Albert C. Wollenberg, Senior United States District Judge and Honorable Stanley A. Weigel, United States District Judge, Northern District of California, constituting a statutory three-judge district court by designation of Chief Judge Richard H. Chambers for the Ninth Circuit.

[1]. At the time the suit was filed, Raymond K. Procunier was the Director of Corrections and Louis S. Nelson was the Warden of the California State Prison at San Quentin. The former has since been replaced by Jiro J. Enomoto and the latter by Robert Rees. Under Fed.R.Civ.P. 25(d), they have been automatically substituted.

reasons. The second challenges conditions of confinement in the units.

█ By the motions now before us, plaintiffs seek summary judgment and injunctive relief only on the first cause of action. They claim that defendants' applicable rules, practices and procedures violate the due process clause of the Fourteenth Amendment.[2]

Plaintiffs claim that defendants act arbitrarily in purporting to conform to their own standards for administrative segregation, i. e., that the inmate constitutes a danger to himself, or to other inmates, or to the staff.[3] The main thrust of plaintiffs' claims lies in their allegations that, in purporting to apply the relevant standards, defendants have denied plaintiffs: Written notice of the charges against them; an opportunity to present witnesses and documentary evidence; an opportunity to confront and cross-examine adverse witnesses; representation by counsel or counsel-substitute; and a written decision stating reasons for confinement in maximum security units. Plaintiffs seek injunctive relief requiring defendants to provide these procedural protections. They also seek expungement from their prison records of any reference to their confinement in maximum security units unless the decision leading to the confinement was made in accordance with the demanded procedures.

Plaintiffs have filed forty-seven affidavits from prisoners confined in maximum security segregation for administrative reasons. Those affidavits, *which are not contradicted*, establish the facts we now summarize.

**2.** The rules are formal orders of statewide application. Hence the need for a three-judge court in this case. 28 U.S.C. § 2281 (1970); *Gilmore v. Lynch,* 400 F.2d 228 (9th Cir. 1968).

 Plaintiffs also allege that the rules violate Art. I, §§ 8 and 13 of the California Constitution. We do not reach that question.

**3.** We emphasize that the facts before us involve only transfer of prisoners from the general prison population to maximum security units

### A. The conditions in maximum security units

Prisoners in the maximum security units are confined in cells approximately five feet wide by eight feet long. The cells are without fresh air or daylight, both ventilation and lighting being poor. The lights in some cells are controlled by guards. It is difficult for prisoners to get needed medical attention. They must eat in their cells or not at all. They are allowed very limited exercise and virtually no contact with other prisoners. They cannot participate in vocational programs. They are denied those entertainment privileges provided for the general prison population. Parole is usually denied to them until after release from maximum security segregation.[4]

It is clear, then, that a prisoner confined in a maximum security unit suffers a loss of liberty much more severe than that experienced by a prisoner in the general prison population. *See Spain v. Procunier,* 408 F.Supp. 534 (N.D.Cal.1976); *Clutchette v. Procunier,* 328 F.Supp. 767 (N.D.Cal.1971), aff'd, 497 F.2d 809 (9th Cir. 1974), *modified,* 510 F.2d 613 (9 Cir. 1975), *rev'd in part on other grounds, Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

### B. The procedures used in ordering administrative segregation

A so-called Classification Committee in each institution is empowered to order prisoners transferred from the general prison population to maximum security for administrative reasons. The Committee is composed of the warden, two associate wardens, the chief psychiatrist, a program administrator and a correctional counselor. Any three members constitute a quorum. The

for *administrative reasons* and confine our decision accordingly.

**4.** As one of the affidavits before us aptly characterizes it, inmates confined in maximum security are "warehoused". The manner of confinement may cause permanent psychological, if not, indeed, physical, damage. If prolonged, it may even destroy the capacity of prisoners to lead a normal life after release. Affidavit of Bernard L. Diamond.

warden has discretion to designate other members of the staff as permanent or temporary members. Defendants' Exhibit A, Department of Corrections Rules and Regulations, Ch. 4, filed Feb. 1, 1976.

Defendants have consistently confined prisoners in maximum security segregation for administrative reasons without first giving them any meaningful hearing. Typically, the inmate is transferred to a maximum security unit before he is brought before the Classification Committee. In many cases, prisoners have been confined in solitary for days—sometimes for weeks—before any hearing. In some cases, inmates have been so confined and not told the reasons, even informally, until appearance before the Committee.

The vagaries and irregularities of defendants' practices are illustrated by the following excerpts from affidavits submitted by plaintiffs (all uncontradicted as noted earlier).

On November 7, 1973, I was taken to North Segregation Unit . . . where I remained confined for about 2½ months.

. . . . .

I have never been involved in violence or convicted of any crimes during my 32 months at San Quentin. . . .

On November 7, 1973, I was taken from my cell in the Mainline to the North Segregation Unit for no reason at all. No formal charges were brought against me. I, along with other Black Muslims, who were also taken from the Mainline, was told that I was being confined . . for "institutional convenience." We were told that we were becoming too militant; that we spent too much time in the yard by ourselves. . . .

On November 14th, one week after being sent to [maximum security], I met with the Classification Committee. . . I was . . . told . . . that they would lock me up "until they figured out what to do with us". . . . I was not told anything more specific. The meeting with the Committee lasted about five minutes. . . .

Affidavit of William E. X. Richmond, Plaintiffs' Exhibit 19.

\* \* \* \* \* \*

In December of 1972 I was removed from an honor wing . . . and placed in [maximum security]. I was told by a two-man classification committee that I was a threat to other inmates and to myself, that they'd gone through my jacket [i. e. the affiant's prison records] and from my past record I appeared to be a threat. However, I was given nothing in writing. . . .

About mid-January of 1974, I went to a committee meeting which lasted about five minutes during which time I was simply told that I was a threat to inmates and would remain in maximum security. At that time, I had had over a year clean time, that is, I had no prison disciplinary reports for that period of time. During this hearing, I had no opportunity to present any witnesses or any evidence in my own behalf, nor was I informed of what evidence the committee was using, except their telling me that it was in my jacket.

Affidavit of Stanley Baliel, Plaintiffs' Exhibit 39.

\* \* \* \* \* \*

On January 19, 1973, I was taken before the main disciplinary committee for a hearing under the allegation of possession and control of a contraband file.

. . .

On January 28, 1973, I was taken before the Institution Classification Committee. . . . [The Committee] advised me that I was exonerated of implication or responsibility in the contraband file. . . .

[The Committee] nevertheless told me it was 'the desire of the committee' to further retain me in Security Housing Unit. When I inquired as to why; [sic] I was being retained in punitive segregation when, by the committee's own admission, I had no disciplinary infractions and had not exhibited any behavioral patters warranting or justifying punitive segre-

gation. [I was told] that I was considered as an "influencial [sic] member of the Mexican Prison Community" and was "believed to have leadership qualities."

Affidavit of Roberto Pablo Salas, Plaintiffs' Exhibit 2 (emphasis in original).

\* \* \* \* \* \*

While at Vacaville I was elected Chairman of Empleo, a Mexican-American organization aiming to achieve unity among Chicanos. After my transfer to Soledad I joined a Latin American culture group called C.A.U.S.A. . . .

. . . . . .

I was in the mainline at Soledad until September of 1972 when after two killings occurred, Soledad was locked down. Along with about fifty other Chicanos, I was taken to . . . the isolation wing. . . . I was never taken before any committee to answer any formal charges. The only reason given to me was that I was suspected of being a leader in Nuestra Familia.

. . . I was accused . . . of being the "Godfather" of that organization as reported by "reliable sources." I asked to confront my accusers but they were never brought forward. I am not now, and have never been associated with Nuestra Familia.

Periodically, my classification would be reviewed. I was told that the only way I could get out of [maximum security] would be to prove that I was not affiliated with Nuestra Familia though I was never told how I should go about proving this. . . . In fact, [the Warden] even told me that he was aware that I was not a leader in Nuestra Familia but he still felt that I should be in [maximum security] because I was "influential" with The Family.

Affidavit of Roberto Frias, Plaintiffs' Exhibit 5.

At the Classification Committee hearing, the inmate may be given a chance to respond to the charges then revealed to him for the first time. However, he is given no opportunity to call witnesses on his behalf nor to confront those who have given information against him. In fact, the sources and even the nature of the information are often not made known to him. Under these circumstances, all the inmate can do is make an unsupported denial of the charges against him. And no written reasons for the Committee's decisions are furnished.

In the face of the foregoing, the most that defendants have shown is that their rules and regulations purport to require that "when possible" prior notice be given of the proposed transfer into maximum security, a hearing be provided and a written statement of the outcome be given the inmate.[5] There is no definition of "when possible". Indeed, there is none as to what is or constitutes a "hearing". The rules do not require or permit the inmate to have counsel or counsel-substitute, nor do they permit him to call witnesses or confront adverse witnesses.[6] Defendants have made no showing that inmates confined in maximum security for administrative reasons are *in fact* given prior notice, a hearing, and a written decision.

### C. *The requirements of due process*

To decide whether a state must afford procedural protections against arbitrary state action, the threshold question is whether a property or liberty interest pro-

---

5. They do not require that a hearing be granted. They simply describe the procedures to be followed if a hearing takes place. They are drafted in such a manner as to make it extremely difficult to determine which rules are presently in effect and what procedures must be followed. At oral argument, even counsel for defendants were unable to inform the court as to these matters.

6. Chapter 4, Article 9, of the rules and regulations of the Director of Corrections provides:

Classification actions that result in a substantial adverse effect on an inmate's conditions of confinement will require when possible advance written notice of the proposed action, a hearing, and a written statement of the findings.

We note again that neither "hearing" nor the words "when possible" are defined.

tected by the Fifth and Fourteenth Amendments is at stake. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Morrissey v. Prewer,* 408 U.S. 471, 481–82, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

In recent cases dealing with due process claims by prisoners, the courts have recognized that

> though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country. . . . [Prisoners] may not be deprived of life, liberty, or property without due process of law.

*Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

■ When a prisoner is transferred from the general prison population to the grossly more onerous conditions of maximum security, be it for disciplinary or for administrative reasons, there is severe impairment of the residuum of liberty which he retains as a prisoner—an impairment which triggers the requirement for due process safeguards. *Clutchette v. Procunier, supra; United States ex rel. Miller v. Twomey,* 479 F.2d 701 (7th Cir. 1973), *cert. denied, Guitierrez v. Dept. of Public Safety,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); *Allen v. Nelson,* 354 F.Supp. 505 (N.D.Cal.1973), *aff'd,* 484 F.2d 960 (9th Cir. 1973).

Defendants contend that these cases are no longer valid in light of two cases recently decided by the Supreme Court, *viz., Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). These decisions hold that a transfer of a prisoner from one institution to another does not impinge on a liberty interest protected by due process unless state law or practice makes such a transfer depend on proof of serious misconduct or the occurrence of other specified events. While the holdings do apply even if conditions in the prison to which the inmate is transferred are more onerous than those prevailing in the prison where he was previously confined, defendants err in claiming these decisions control the questions presented to us in this case.

*Meachum* and *Montanye* hold only that some discretionary decisions of prison officials, such as the decision to transfer a prisoner to another institution, do not result in such a substantial invasion of a prisoner's liberty interest as to trigger the need for due process protections. The Supreme Court explicitly stated that the transfer decisions did not result in confinement in maximum security segregation. *Meachum v. Fano, supra,* 427 U.S. at 219, 96 S.Ct. 2532; *Montanye v. Haymes, id.* 427 U.S. 236, 96 S.Ct. 2543. Contrary to defendants' contention, these opinions do not hold that a prisoner may be confined in maximum security segregation "for whatever reason or for no reason at all", regardless of the extent of the deprivation caused by such segregation.

> [Imposition of "solitary" confinement] represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here . . . there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction.

*Wolff v. McDonnell, supra,* 418 U.S. at 571–72, n. 19, 94 S.Ct. at 2982.

■ Moreover, *Meachum* and *Montanye* hold that if the state itself imposes limits on its discretion by conditioning decisions such as prison transfers on a specific standard being met, the state creates a liberty interest which is protected by due process. This is true whether the limits which the state imposes on itself stem from statute, rule, or regulation. *Meachum v. Fano, supra,* 427 U.S. at 226, 96 S.Ct. 2532.

Here, defendants have limited the discretion of the classification committees by statewide regulations which define the circumstances under which an inmate may be confined in maximum security for adminis-

trative reasons. In its most recent version, Chapter 4, Article 6 of the rules and regulations of the Director of Corrections provides:

§ 3330. General Policy. (a) Inmates must be segregated from others when it is *reasonably* believed that they are a menace to themselves and others or a threat to the security of the institution. Inmates may be segregated for medical, psychiatric, disciplinary, or administrative reasons. *The reason for ordering segregated housing must be clearly documented by the official ordering the action at the time the action is taken.* (Emphasis added.) [7]

■ Thus, the inmate has an interest, conferred by statewide regulation and protected by due process, in not being confined in maximum security segregation unless he is found, for clearly documented reasons, to come within the standard set by the rules. We now consider what procedures are required.

■ The Supreme Court has dealt with that question when state prison inmates are deprived of significant privileges or confined in maximum security for *disciplinary* reasons. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In such cases, *Wolff* establishes that the prisoner must be given: An opportunity to appear before the decision-making body; written notice of the charge against him in advance of the hearing; an opportunity to present witnesses and documentary evidence "when [it] will not be hazardous to institutional safety or correctional goals"; a written statement of the reasons for the decision to punish him and of the evidence on which it is based; and, if he is illiterate or if the issues are complex, counsel-substitute (either a fellow inmate or a member of the prison staff) to help prepare his defense.

■ Defendants have made no showing that prison administration or safety will be jeopardized if defendants are required to accord plaintiffs at least the minimal protections called for by *Wolff* in the case of disciplinary sanctions. These minimal protections are essential if the inmate is to have any chance whatever to prove that he does not represent a risk to the security of the institution and thereby to avoid subjection to the severe deprivations of confinement in maximum security. Indeed, defendants' interest in preventing prison violence may be well served by making fair procedures requisite to maximum security confinement. Plaintiffs have placed before us expert testimony—not contradicted—indicating that implementation of fair procedures decreases tensions in prisons and eases the work of prison administrators. Affidavits of John Boone, former Commissioner of Convictions for Massachusetts, and David Fogel, Executive Director of the Illinois Law Enforcement Commission, attached to Plaintiffs' Supplemental Response re Motion for Preliminary Injunction and Partial Summary Judgment filed February 18, 1976.

In holding that plaintiffs may not be confined in maximum security for *administrative* reasons unless they have been provided, minimally, with the safeguards required for such confinement for *disciplinary* reasons, we do not reach the question as to whether even more procedural protections must be required for such confinement for administrative reasons. The deprivation suffered by a prisoner confined for administrative reasons is greater than that suffered by one confined on a disciplinary charge. The latter is for a definite term, generally for a maximum of ten days. In contrast, administrative segregation is for an indefi-

---

7. This version of the regulation became effective on July 1, 1976. The prior version read:

Inmates must be segregated from others when it becomes evident that they are a menace to themselves or others, or to property or to the morale of the general population. Inmates may be segregated for medical, psy-

chiatric, disciplinary or administrative reasons. . . . The reason for segregation of an inmate must be clearly documented by the official ordering the action, at the time such action is taken. Such action requires full classification committee review at the next regular meeting.

nite period—the prisoner may be confined for months, even years, without hope of release. The charges at a disciplinary hearing are definite and narrow. The inmate is accused of violating a prison rule. In contrast, as is evidenced by plaintiffs' exhibits, the charges at a hearing resulting in administrative confinement tend to be vague, and are frequently based on mere rumor, suspicion, or conjecture. In this connection we deem it appropriate to note that the circumstances and issues involved in decisions leading to administrative segregation may well, upon a proper showing, demonstrate the necessity for additional procedures to make hearings adequate.[8] *See generally* Tobriner & Cohen, *How. Much Process is "Due"? Parolees and Prisoners,* 25 Hastings L.J. 801 (1974); *Gagnon v. Scarpelli,* 411 U.S. 778, 790, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); N. Morris, The Future of Imprisonment 30–34, 62–73 (1974).

However, on the basis of the record before us in this case, we are unable to find that all the relief sought by plaintiffs is constitutionally required insofar as it exceeds that required by *Wolff.* There is not sufficient evidence now before us in this case to show the effect such extensive procedural requirements would have on the administration of California prisons. Without such evidence, we are unable to determine with sufficient certainty "the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

Should it appear that the relief we grant today fails adequately to correct defendants' arbitrary practices in imposing administrative segregation, plaintiffs are not foreclosed from seeking further relief consistent with valid correctional goals and prison safety requirements.

■ We decline to order that defendants expunge references in prison records to findings that plaintiffs are not suited to be housed in the general prison population. We do not believe that it would be appropriate to require expungement in light of the burden it would place on prison officials. *Wolff v. McDonnell, supra,* 418 U.S. at 573–74, 94 S.Ct. 2963.

In the light of all the foregoing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiffs' motion for summary judgment is granted;

IT IS FURTHER ORDERED that defendants, their agents, servants, employees, and all persons in active concert and participation with them be and are hereby restrained and enjoined from continuing to cause, authorize or permit transfers of prisoners from the general prison population into maximum security housing units in order to segregate such prisoners for "administrative" reasons or purposes without first providing each such prisoner with the following procedural safeguards:

(1) written notice of the reasons in sufficient detail to enable the prisoner to prepare a response or defense, said notice to be furnished, except in case of genuine emergency, before initial placement in the maximum security unit, but, in any event, not more than forty-eight (48) hours after such initial placement;

(2) a fair hearing before one or more prison officials, said hearing to be held not less than seventy-two (72) hours after placement in the maximum security unit unless the inmate requests, in writing, additional time in which to prepare a defense;

(3) representation by counsel-substitute when prison officials determine that the inmate is illiterate or that the complexity of the issues makes it unlikely that he can collect and present the evidence necessary for an adequate comprehension of the case; determination and

---

**8.** Defendants' rules provide that in disciplinary cases resulting in confinement in maximum security, the disciplinary committee must carefully evaluate information provided by secret informants, and must have evidence corroborating such information if it is relied upon. Those rules also require that in such cases a summary of the evidence obtained from the confidential source be given to the inmate if to do so will not reveal the source's identity. No such rules pertain to cases resulting in maximum security segregation for administrative reasons.

designation of counsel-substitute to be made at the time of the giving of the aforesaid notice; if counsel-substitute is not provided, the reasons must be stated in writing at the time of the hearing;

(4) an opportunity to present witnesses and documentary evidence unless prison officials determine in good faith that permitting such evidence will be unduly hazardous to institutional safety or correctional goals;

(5) a written decision including references to the evidence relied upon and the reasons for such confinement.

In the event of a continuing emergency, such as a prolonged riot, which, in the good faith determination of prison officials, prevents notice and hearing as required above, said notice and hearing must be provided as soon as is practical.

IT IS FURTHER ORDERED that plaintiffs and those members of sub-class (3) involuntarily confined for administrative reasons be immediately accorded the procedural safeguards hereinabove specified.

IT IS FURTHER ORDERED that within ten (10) days hereafter, defendants (1) provide a copy of this order to each prisoner confined in maximum security for administrative reasons and (2) post copies where they may be readily seen by all other members of the class.