May 10, 1978

## 78-24 MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, OFFICE OF LEGISLATIVE AFFAIRS

### Bureau of Prisons—Inmates—Administrative Segregation—Due Process

We understand that the Department is formulating standards to guide the operation of Federal penal institutions. In connection with this effort, you have requested our opinion on what procedural protections, if any, are constitutionally required in transferring inmates from the general prison population to "administrative" segregation.[1] You also asked whether procedural requirements of such transfers are dependent upon the existence of a statutory or any other legally recognized right to remain in the general population. Finally, you asked whether such requirements would differ if the transfer were made in the context of a "classification" procedure,[2] rather than a disciplinary procedure.

We conclude that the Constitution requires, except in exigent circumstances, certain due process procedures prior to transferring a Federal inmate, against his or her will, from the general prison population to administrative segregation. In emergency cases, where time does not permit prior review, these procedures must be followed within a reasonable time after transfer. Further, we believe the same procedure applies whether the transfer is based upon administrative or disciplinary reasons.

The Bureau of Prisons has adopted Policy Statement No. 7400.5D, July 7, 1975, on inmate discipline that defines the term "administrative detention" as

> . . . the status of confinement which results in a loss of some privileges which the inmate would have if assigned to the general population. Administrative detention is to be used only where the

---

[1] We understand that you use the term "administrative segregation" interchangeably with the term "administrative detention," as that latter term is used by the Bureau of Prisons. *See, infra,* pp. 2-3.

The Bureau of Prisons advised this Office that administrative detention is comparable, in terms of physical restrictions, to disciplinary segregation.

[2] By "classification" procedure, we understand you to mean a procedure, resulting in segregation, which is not instituted for disciplinary reasons.

continued presence of the inmate in the general population poses a serious threat to life, property, himself, other inmates, staff members or the security of the institution.

An inmate may be placed in administrative detention only if he poses the kind of threat described above, *and* when he:

a. Is pending a hearing for a violation of institution rules or regulations;

b. Is pending an investigation of a violation of institution rules or regulations;

c. Is pending investigation or trial for a criminal act;

d. Requests admission to administrative detention for his own protection or the staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection;

e. Is pending transfer or is in holdover status during transfer; or

f. Is pending classification. [*Id.*, p. 16]

Further, when an inmate is placed in administrative detention the policy statement requires that

. . . [a] memorandum detailing the reason for placing an inmate in administrative detention will be prepared and given to members of the inmate's unit or team, with a copy to the Operations Supervisor of the administrative detention unit. A copy of this memorandum will also be given to the inmate provided institutional security is not thereby compromised. [*Id.*]

Finally, involuntary administrative detention is to be used only for short periods of time. *Id.*, at 17.

In determining whether one is entitled to procedural protections against arbitrary governmental action, the threshold question is whether a property or liberty interest protected by the Constitution is at stake. *Wright* v. *Enomoto,* 462 F. Supp. 397 (N.D. Cal. 1976) (three-judge court), *aff'd,* 434 U.S. 1052, 1978; *Board of Regents* v. *Roth,* 408 U.S. 564 (1962); *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 482 (1972). The inquiry is whether a prison inmate has a constitutionally cognizable liberty interest in remaining in the general prison population. If the answer is in the affirmative, the inmate may be stripped of that interest only if there is compliance with due process requirements commensurate with the nature of the interest involved. *Cf., Cafeteria and Restaurant Union Workers* v. *McElroy,* 367 U.S. 886, 894-95 (1961).

The three-judge district court in *Enomoto* held (p. 402):

When a prisoner is transferred from the general prison population to the grossly more onerous conditions of maximum security, be it for disciplinary or for administrative reasons, there is severe impairment of the residuum of liberty which he retains as a prisoner—an impairment which triggers the requirement for due process safeguards. *Cluchette* v. *Procunier,* [497 F. (2d) 809 (9th Cir. 1974),

100

*modified,* 510 F. (2d) 613 (1975), *rev'd in part on other grounds,* 425 U.S. 308]; *United States ex rel. Miller* v. *Twooney,* 479 F. (2d) 701 (7th Cir. 1973), cert. denied, 414 U.S. 1146 (1974); *Allen* v. *Nelson,* 354 F. Supp. 505 (N.D. Cal. 1973), *aff'd,* 484 F. (2d) 960 (9th Cir. 1973). [*Id.,* p. 13]

In *Enomoto,* California claimed that the foregoing proposition was no longer viable after the Supreme Court's recent decisions in *Meachum* v. *Fano,* 427 U.S. 215 (1976), and *Montanye* v. *Haymes,* 427 U.S. 236 (1976). These cases hold that a prisoner has no constitutionally protected interest against being transferred from one institution to another even if the receiving institution has more onerous living conditions than the sending institution, unless State law or practice conditions the transfer upon serious misconduct or the occurrence of some other specified event.[3]

In rejecting the contention that these cases have undermined the notion that due process requirements apply where a prisoner is transferred to "grossly more onerous conditions," the court stated (p. 402):

> *Meachum* and *Montanye* hold only that some discretionary decisions of prison officials, such as the decision to transfer a prisoner to another institution, do not result in such a substantial invasion of a prisoner's liberty interest as to trigger the need for due process protections. The Supreme Court explicitly stated that the transfer decisions did not result in confinement in maximum security segregation. *Meachum* v. *Fano, supra,* 427 U.S. 219; *Montanye* v. *Haymes, id.,* 427 U.S. 236. Contrary to defendants' contention, these opinions do not hold that a prisoner may be confined in maximum security segregation "for whatever reason or for no reason at all," regardless of the extent of the deprivation caused by such segregation.
>
> . . . [Imposition of "solitary" confinement] represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here . . . there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. [*Wolff* v. *McDonnell, supra,* 418 U.S. at 571-72, n. 19.]

The Court went on to state that *Meachum* and *Montanye* hold that if the State "imposes limits on its discretion by conditioning decisions such as prison transfers on a specific standard being met, the state creates a liberty interest which is protected by due process." *Ibid.* The court further found that

---

[3]On April 24, 1978, the Supreme Court heard oral argument in *Vitek* v. *Miller,* 437 F. Supp. 569, a case raising the question whether due process requirements apply where prisoners are transferred from a State correctional institution to a State mental hospital. The Court vacated the judgment and remanded the case for consideration of the question of mootness. *Vitek* v. *Jones,* 436 U.S. 407 (1978).

California had created such a liberty interest by virtue of the following regulation:

§ 3330. General Policy. (a) Inmates must be segregated from others when it is reasonably believed that they are a menace to themselves and others or a threat to the security of the institution. Inmates may be segregated for medical, psychiatric, disciplinary, or administrative reasons. The reason for ordering segregated housing must be clearly documented by the official ordering the action at the time the action is taken.[4]

It therefore held that the State had, with this regulation, created a liberty interest which could only be withdrawn consistent with due process guarantees. The Supreme Court affirmed, without opinion, the three-judge court ruling in February 1978 (over the dissents of the Chief Justice and Justice Rehnquist).

Policy Statement No. 7400.5D closely parallels this regulation in that it provides for administrative segregation of prisoners where they pose a threat to themselves, others, or the security of the institution. The policy statement also requires documented reasons for placing an inmate in administrative detention. Therefore, following the analysis of *Enomoto,* the Federal Government has created a liberty interest not subject to withdrawal without due process protections.[5]

Federal prisoners are entitled to due process safeguards before they are transferred to administrative detention unless exigent circumstances require immediate transfer. In these latter situations the hearing should be held at the earliest possible time thereafter. The procedures should be followed whether the transfer is for disciplinary or administrative reasons. *Enomoto, supra,* at 13.

Having concluded that the transfers in question implicate a liberty interest to which due process guarantees attach, we now turn to the question of what process is due. *Wolff* v. *McDonnell,* 418 U.S. 539 (1974), held that in a prison proceeding the following procedures must be observed: (1) The inmate must be given written notice of the charges against him and a reasonable time after receiving notice, no less than 24 hours, to respond. (2) There must be a written statement by the prison authorities as to the evidence relied on and the reasons for the action taken. (3) When it would not be unduly hazardous to institutional safety or correctional goals, the inmate should be allowed to call witnesses and present documentary evidence in his defense. (4) Finally, where an illiterate inmate is involved or the issue is so complex, making it unlikely that the inmate will be able to marshal and present the necessary evidence for his case, he should be allowed to solicit the aid of a fellow inmate or have the prison designate someone to assist him.

---

[4]Chapter 4, Article 6, of the Rules and Regulations of the California Director of Corrections.

[5]*See also* 18 U.S.C. § 4081, providing, *inter alia,* that penal and correctional institutions should assure proper classification and segregation of prisoners according to the nature of the offense, the prisoner's character and mental condition, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of persons committed to such institutions.

The court in *Enomoto* fashioned its judgment using the *Wolff* decision as a pattern and established procedures to govern cases in which inmates were "involuntarily confined for administrative reasons." While neither *Wolff* nor *Enomoto* should be read as imposing inflexible requirements under all circumstances, those cases should be regarded as the necessary starting point in drafting appropriate departmental standards.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
