David **FIERRO**, Plaintiff-Appellant,

v.

Ellis C. **MacDOUGAL**,
Defendant-Appellee.

No. 80–5045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 15, 1981.

Decided June 1, 1982.

Corrected June 22, 1982.

Majority Opinion see 685 F.2d 441 (Table).

Rehearing Denied Dec. 15, 1982.

David Fierro, pro se.

Jay R. Akdins, Thomas A. Jacobs, Asst. Attys. Gen., Phoenix, Ariz., for defendant-appellee.

Before POOLE and BOOCHEVER, Circuit Judges and GILLIAM,* District Judge.

nia, sitting by designation.

BOOCHEVER, Circuit Judge, dissenting:

Fierro challenged on due process grounds his transfer from the general population of the state prison to "administrative segregation" where he would not receive "good time" credit. I agree with the majority, that the district court properly dismissed Fierro's petition for mandamus because he seeks to have us compel action by a state official. 28 U.S.C. § 1361.

I respectfully dissent, however, from the majority's conclusion that Fierro could not have amended his complaint to state a viable claim under § 1983. Courts should construe pleadings filed by *pro se* litigants like Fierro liberally, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972); *Gillespie v. Civiletti*, 629 F.2d 637, 640 (9th Cir. 1980), and avoid dismissal unless it "is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980). *See generally Franklin v. Oregon*, 662 F.2d 1337 (9th Cir. 1981). It simply is not "clear on the record", as the majority asserts, that Fierro was afforded the minimum procedural due process mandated by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and its progeny when he was transferred to administrative segregation. I believe the majority errs in denying Fierro the opportunity to prove that Arizona law creates a liberty interest in good-time credit and a certain level of custody and that the Arizona prison system deprived him of those interests without the procedural safeguards mandated by the Fourteenth Amendment. *See Lokey v. Richardson*, 600 F.2d 1265 (9th Cir. 1979) (per curiam).

# I

## *Fierro's Liberty Interest*

### A. Analytical Framework

In *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981), this court held that a class of California prisoners was not entitled to procedural due process following a prison-wide "lockdown" because California's statutes, regulations and prison customs did not create a justifiable expectation of any particular level of prison-wide security. The court relied upon *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) (procedural due process not constitutionally mandated for interprison transfers) rather than *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976), *aff'd mem.*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) (procedural due process required) on the grounds that procedural due process is required only where the state has created a liberty interest by conferring a particular benefit, such as entitlement to good-time credit or a certain level of security, with a specification of the conditions under which the benefit can be lost. 629 F.2d at 601. We noted in *Hayward* that "crucial" to the Supreme Court's decisions in *Meachum* and *Montanye* was the conclusion that state law "did not give rise to any justifiable expectation on the part of prisoners that they would not be transferred for any reason or no reason." *Id. See also Wakinekona v. Olim*, 664 F.2d 708 (9th Cir. 1981) (as amended), *cert. granted*, 50 U.S.L.W. 3943 (May 23, 1982).[1] Applying *Hayward*'s ana-

---

1. Our analysis in *Hayward* was carried a step further in *Wakinekona*, where we held that Hawaii's prison regulations governing interstate transfers created a liberty interest subject to due process protection. We rejected the state's argument that there was no state-created liberty interest because the administrator was not bound by the committee's recommendation and, as a result, inmates were, as a practical matter, "transferable at will" within the meaning of *Meachum* and *Montanye*. 664 F.2d at 712. The existence of the procedural scheme itself was enough to create a liberty interest in having the procedure followed. *Id.* at 711–12. Judge Goodwin argued in dissent that it is the nature of the interest at stake, rather than the scope of the procedure implemented to safeguard the interest, that should determine whether a liberty interest is at stake. Under Judge Goodwin's analysis, a liberty interest exists only if the inmate can "demonstrate the existence of a right rooted in state

lytical framework to the present case demonstrates that Fierro clearly had a liberty interest under Arizona law entitled to due process safeguards.[2]

## B. Arizona Law

Sentence reduction for good behavior is a matter of statutory right under Ariz.Rev. Stat.Ann. § 41–1604.07 (amending and replacing, effective October 1, 1978, Ariz.Rev. Stat.Ann. § 31–251). *See, e.g., State v. Barnard*, 126 Ariz. 110, 612 P.2d 1073–74 (1980); *State v. Rice*, 110 Ariz. 210, 516 P.2d 1222, 1225 (1973); *Davis v. State ex rel. Eyman*, 6 Ariz.App. 29, 429 P.2d 521 (1967).

The statutes and regulations governing Arizona's prisons have been substantially revised and reorganized in recent years. The shifting coverages that have resulted from these extensive changes make it difficult to ascertain exactly which provisions apply to Fierro's situation. A review of the pertinent portions of the statutes and regulations, however, and of the Arizona Supreme Court's decisions indicates that Fierro had a legitimate liberty interest.

To comply with the requirements embodied in an unpublished order issued by the Arizona District Court on August 23, 1973 [referred to by the parties as the "Copple Rules"], the Arizona Department of Corrections developed a system of procedures and rules governing the control and conduct of prisoners. The Department published these rules in 1976 in what is known as the Inmate Reference Manual. *See Dickey v. Raines*, 124 Ariz.App. 135, 602 P.2d 516, 517 (1979). The Arizona Supreme Court subsequently held that the Department was under a legal obligation to promulgate its rules under the state's administrative procedure act. *Thomas v. Arizona State Board of Pardons and Paroles*, 115 Ariz. 128, 564 P.2d 79 (1977).

When Fierro was sentenced to prison on May 8, 1978, the Department had not yet promulgated into regulation those portions of the Inmate Manual pertaining to custody-level reassignments and good time. At that time, however, Ariz.Rev.Stat. § 31–251 provided that an inmate could be deprived of good time only after pre-forfeiture notice and proof that the inmate had violated a prison rule with "violence or evil intent."

Effective October 1, 1978, the former Ariz.Rev.Stat. § 31–251 was replaced by § 41.1604.07. Section 41.1604.07 provides in part:

> Upon reclassification of a prisoner resulting from such prisoner's failure to adhere to the rules and regulations of the department ... the director may declare any and all release credits earned by the prisoner forfeited....

Although, in contrast to its predecessor, § 41–1604.07 does not specify the conditions under which the director should exercise his discretion to forfeit release credits or the procedures that must accompany forfeiture, those concerns are covered in extensive regulations that were also effective October 1, 1978. These regulations, principally Ariz. Admin.Comp. Rules and Regs., *Corrections* §§ R5–1–401 to 403 (Supp. 79–4) (hereinafter *"Corrections"*), incorporate by reference the Inmate Manual's disciplinary procedures, and specify in great detail the conditions and procedural safeguards applicable to transfer into higher security levels and forfeiture of good time.

An apparent difficulty in Fierro's case arises because Ariz.Rev.Stat. § 41–1604.07, the new statute authorizing forfeiture of good time, appears to apply to all forfeitures made on or after October 1, 1978,

law that limits the prison administrator's discretion to transfer him...." 664 F.2d at 713. Judge Goodwin concluded that Hawaii's grant of discretionary transfer authority to the prison administrator was too broad to support a justifiable expectation that an inmate would not be transferred without some specified event or finding. *Id.* The Hawaii Supreme Court reached the same conclusion in a decision published while *Wakinekona* was under submis-

sion. *See Lono v. Ariyoshi*, 621 P.2d 976, 980–81 (Hawaii 1981).

2. Although the majority does not expressly decide whether Fierro possessed a liberty interest, the issue is addressed here because a liberty interest is a prerequisite for entitlement to due process safeguards and the State argues that Fierro lacked such an interest.

while the accompanying limiting regulations apply only to prisoners serving time for offenses committed after October 1, 1978. *Corrections* § R5–1–402. Fierro lost his good time in July, 1979, after the new statute was in effect, but was serving time for an offense committed before the regulations were in effect.

Nevertheless, the fact that the Department had not yet promulgated its rules into regulations that were applicable to Fierro does not mean that the Department was free to ignore such rules or that they were insufficient to create a liberty interest. In *Brown v. State*, 117 Ariz. 476, 573 P.2d 876 (1978), the Arizona Supreme Court rejected the Department's claim that Arizona prisons did not have to comply with regulations that were not yet properly promulgated. The court noted that:

> The Department cannot grant privileges to one group of prisoners and arbitrarily deny the same privileges to another prisoner because it chooses to find its regulations valid in one instance and invalid in another. Obviously the Department must comply with the law and file its regulations with the Secretary of State, but in the meanwhile the current lack of regulations cannot be used to confer benefits on some prisoners and not on others in substantially the same condition.

*Brown*, 573 P.2d at 879. Unless the Department follows its regulations, a prisoner is subject to the unequal treatment condemned by the *Brown* court.

The principal issue in *Brown* was whether the inmate had a liberty interest in not having "double time," a type of good-time earned by prisoners performing certain types of "high trust" labor (*see* Ariz.Rev. Stat. § 31–252, amended and recodified after *Brown* at § 31–144), forfeited by arbitrary state action. The Arizona court addressed the issue in light of the distinction between *Wolff v. McDonnell* and *Meachum v. Fano*. Although its language in remanding the matter to the Department of Corrections to reconsider the application for good-time credits is indirect, the court's de-

cision supports a finding that Arizona prisoners have a liberty interest in the right to equal protection under rules and regulations that affect good-time. *See* 573 P.2d at 878.

A similar rationale underlies the Arizona court's subsequent decision in *Malumphy v. MacDougall*, 125 Ariz. 483, 610 P.2d 1044 (1980). In *Malumphy*, the court rejected the Department's contention that rules and regulations governing inmate-custody criteria need not be filed with the Secretary of State because they concerned only the internal management of the agency. The court notes that:

> the unfiled regulations materially affect the type of existence a sentenced prisoner will endure, which ranges from "intensive" custody, twenty-four-hour lockup, to "trusty." Regulations of this type which affect *such important interests* are the type of regulations which must be filed with the Secretary of State.

(emphasis added). 610 P.2d at 1044.

Under Arizona law, Fierro was clearly deprived of a liberty interest when he was transferred into a more restrictive level of security where he lost good time. As in *Wolff*, Arizona has conferred a particular benefit, namely entitlement to good-time, with a specification of the conditions under which the benefit can be lost. Thus, in contrast to the inmates affected by the lockdown in *Hayward v. Procunier*, Fierro had a justifiable expectation under Arizona law that he would not be deprived of his eligibility for good-time "for any reason or no reason." 629 F.2d at 601.

The liberty interest in this case is clearer than the liberty interest found to exist in *Wakinekona*. In *Wakinekona* we found such an interest because Hawaii had established procedural steps to be complied with before an inmate could be transferred to an out-of-state prison. This liberty interest was held to exist despite the fact that there was no justifiable expectation under Hawaiian law that an inmate would not be transferred without some specified event or finding. 664 F.2d at 712. In Arizona, by contrast, the inmate has a legally supporta-

ble expectation of accumulating and retaining good-time unless it is determined, after notice and a fair hearing, that he has violated a prison rule or is a threat to institutional security. *Corrections*, R5 1–402(c)(2–4). Moreover, unlike the decision to transfer inmates at issue in *Wakinekona*, which was totally discretionary, an Arizona inmate has a justifiable expectation of not forfeiting good-time and not being transferred into the harsh confines of administrative segregation based on unbridled discretion. *See Brown*, 573 P.2d at 878–79.

Two additional factors make this an easier case than *Wakinekona*. First, an Arizona prisoner's interests in good-time and in avoiding arbitrary transfer into administrative segregation are more traditional types of liberty interests than the largely procedural interests involved in *Wakinekona*. Thus, finding a liberty interest in this case is warranted even under the more rigorous test set forth in Judge Goodwin's *Wakinekona* dissent. Second, the Arizona Supreme Court's decisions strongly support a finding of a liberty interest in this case.

## II

### *The Applicable Due Process Safeguards*

Once it has been established that a liberty interest is at stake, it is necessary to determine whether adequate procedural safeguards have been followed. The procedural safeguards required when an inmate is deprived of a liberty interest turns on the nature of the liberty interest.[3] In this case, Fierro's liberty interest involves both loss of good-time credit and transfer from the general prison population to administrative segregation. The Supreme Court has considered the due process question in both contexts.[4]

The Court held in *Wolff v. McDonnell* that the deprivation of a state-created right to good-time credit requires the following procedural safeguards: (1) written notice of the reasons for the sanctions given early enough and in sufficient detail to enable the prisoner to prepare a response; (2) a prompt and fair hearing; (3) an opportunity to call witnesses and present evidence when doing so will not be unduly hazardous to institutional safety or correctional goals (there is no right to confront or cross-examine adverse witnesses); (4) representation by counsel-substitute when necessary for an adequate presentation of the issues and evidence; and (5) a written statement setting forth the evidence relied upon and the reasons for the disciplinary action. 418 U.S. at 563–66, 569–70, 94 S.Ct. at 2978–79, 2981.

In *Wright v. Enomoto*, the Court approved a nearly identical set of procedural safeguards that a three-judge district court required California prisons to follow when transferring inmates to administrative segregation. *See* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756, *summarily aff'g*, 462 F.Supp. at 404–05. The district court noted in *Wright* that *Wolff* established only the minimum level of procedure necessary to satisfy due process. Although it was not prepared to reach the issue on the record before it, the district court noted that greater safeguards are probably warranted when the transfer into a higher level of security is made for "administrative" reasons, as in *Wright* and in Fierro's case, than when it is made for "disciplinary" reasons, as in *Wolff*. The charges at a disciplinary hearing are specific and narrow—alleged violation of a specific prison rule—and any resulting punishment is for a definite period. *Wright*, 462 F.Supp. at 403–04. In contrast, as is apparent in Fierro's case,

---

3. *Compare Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (involuntary transfer to mental hospital requires full panoply of due process safeguards plus the right to an attorney) *with Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (minimal liberty interest created by Nebraska statutory procedure for early parole release obviates need for extensive procedural process). *See also Sherman v.*

*MacDougall*, 656 F.2d 527 (9th Cir. 1981) (discussing procedures that must accompany prison censorship of legal and personal mail).

4. The Court recently granted certiorari in a Third Circuit case involving administrative segregation. *See Hewitt v. Helms*, 655 F.2d 487, 502 (3d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 1629, 71 L.Ed.2d 865 (1982).

"administrative segregation is for an indefinite period ... [and the charges] tend to be vague, and are frequently based on mere rumor, suspicion, or conjecture." *Id.*

To properly evaluate the adequacy of the procedural safeguards attending Fierro's transfer, it is first necessary to examine the facts of the case.

## A. Pertinent Facts

In July, 1979, without a prior hearing, Fierro was transferred from the general prison population, where he received good-time credit and earned 13¢ an hour working in the kitchen, to administrative segregation. In administrative segregation he received no good-time credit and could not work. Several hours after his transfer, Fierro was notified in writing that he was being confined in administrative segregation because he was "considered a threat to the orderly operation of this institution and the safety of other inmates" because "information has been received [from three informants that he was] involved in running a protection racket on main line kitchen." Six days later, Fierro wrote the Director of the Arizona Department of Corrections, requesting a "fair hearing." Twelve days after his transfer, Fierro appeared before the Intensive Custody Committee at an Administrative Segregation hearing. According to Fierro, prison officials did not inform him of the guidelines or criteria it relied upon in determining that the transfer was appropriate. He thereby implies that he was not afforded a suitable opportunity to defend. He claims that the hearing was a brief:

> virtuall [sic] onesised [sic] interrogation by prison officials, inquiring into whether or not Petitioner was in any way involved with the extortion racket. In general, the prison officials appeared to react with hostility toward Plaintiff, and made inflammatory remarks to the effect that "they think" that Petitioner is involved with the Mexican Mafia.

The Intensive Custody Committee affirmed the transfer in a one paragraph decision, citing "recent probable extortion of others in Cell Block # 1" as the sole reason.

Approximately one month after its initial decision, the Intensive Custody Committee reviewed Fierro's custodial status and interviewed him. The Committee decided that Fierro should remain segregated from the prison's general population pending further review in ninety days. The only reason given for the Committee's decision was Fierro's "institutional record." Fierro contends that the disciplinary reports on his institutional record were too minor to justify indefinite confinement in administrative segregation.

## B. Adequacy of Prison's Procedure

Although Fierro was not deprived of his liberty interests without some procedural safeguards, the process he was afforded failed to satisfy the standards articulated in *Wolff* and *Wright.*

1. *Notice*: Fierro did not receive any notice regarding the transfer until several hours after it occurred, and then was told only that he was considered a threat to the institution and other inmates because undisclosed informants had indicated that he was involved in running a protection racket in the kitchen. It is arguable whether this notice was constitutionally adequate. *Wolff* requires only that notice be given no less than 24 hours before the hearing, and must be detailed enough "to clarify what the charges are." 418 U.S. at 564, 94 S.Ct. at 2978.

Citing the graver consequences attending confinement in administrative segregation than the loss of good-time credit at issue in *Wolff*, the *Wright* court required the notice to precede the initial transfer "except in case of genuine emergency." 462 F.Supp. at 404. The need for this added requirement is obvious if the inmate is to have any hope of exercising his right to a meaningful opportunity to marshall facts and witnesses in his defense. *See Wolff*, 418 U.S. at 564, 94 S.Ct. at 2978. The present record contains no evidence that Fierro's transfer was prompted by a genuine emergency. Moreover, regardless of whether the notice was timely, it did not clarify the issues or identi-

fy the evidence relied upon sufficiently to enable Fierro to prepare a defense.

2. *Prompt fair hearing*: *Wright* requires a fair hearing to be held within 72 hours (three days) of the inmate's transfer to administrative segregation. 462 F.Supp. at 404. Fierro's hearing was not held until twelve days after his transfer. Moreover, there is nothing in the record to rebut Fierro's contention that the hearing was cursory and unfair.

3. *Written record*: The most serious flaw in the procedure afforded Fierro is the inadequate record compiled by the Intensive Custody Committee. The only reason given in the Committee's initial decision was Fierro's "recent probable extortion of others in Cell Block # 1." The decision following the second hearing (held almost six weeks after the initial transfer) was even more vague, citing Fierro's "institutional record" as the only reason for retaining him in administrative detention. Neither decision discusses the evidence introduced at the hearings or the criteria the Committee relied upon in reaching its decisions. The statements thus fall far short of *Wolff's* requirement that a written record be provided in order to protect the inmate from collateral consequences and to insure that prison officials acted fairly. *Wolff*, 418 U.S. at 565, 94 S.Ct. at 2979. *See also Chavis v. Rowe*, 643 F.2d 1281, 1286–87 (7th Cir. 1981).

Adequate records are particularly important because without them it is impossible for a reviewing agency or court to determine whether the inmate's other procedural rights were abridged. For example, the absence of adequate records makes it impossible to ascertain whether Fierro was given an opportunity to present witnesses and documentary evidence, or, if he was not allowed to do so, why the denial was necessary to preserve institutional safety or correctional goals. The Committee's decision notes only that Fierro was not allowed to cross-examine adverse witnesses, a permissible position under *Wolff*. Similarly, the lack of an adequate record makes it impossible to determine whether a counsel-substi-

tute should have been appointed pursuant to the criteria set forth in *Wolff* and *Wright*. Given Fierro's alleged connection to the "Mexican Mafia" and the awkwardness of his pro se briefs, it is not inconceivable that he may have difficulty with the English language and needed assistance at the hearing.

### III

*Conclusion*

Fierro's complaint clearly alleged facts which, if proven, would establish a viable § 1983 claim for deprivation of a state-created liberty interest without adequate due process safeguards. I believe that Fierro should be given the opportunity to amend his complaint and that the issues are sufficiently complex to warrant the appointment of counsel on Fierro's behalf.