| ATTORNEY | LITIGATION FEES (.50 Bonus Applied) | LITIGATION FEES (.25 Bonus Applied) | FEE APPLICATION (No Bonus Applied) | TOTAL |
|---|---|---|---|---|
| Ennis | $369,149.95 | $ 50,811.70 | $ 4,099.06 | $ 424,060.71 |
| Hansen | 76,120.46 | 118,817.70 | 12,204.72 | 207,142.88 |
| Kirklin | 102,688.89 | 1,897.26 | 13,713.75 | 118,299.90 |
| Feldt | 12,780.00 | | | 12,780.00 |
| Finkel | 6,840.00 | | 280.00 | 7,120.00 |
| Barrett | 461,334.79 | 85,217.28 | 5,118.96 | 551,671.03 |
| Leonard | 18,000.00 | | | 18,000.00 |
| Kellermann | | 50,631.95 | 209.44 | 50,841.39 |

| | | |
|---|---|---|
| | TOTAL ATTORNEY'S FEE | $1,389,915.91 |
| | COSTS | 16,835.48 |
| | TOTAL FEE and COSTS | $1,406,751.39 |

Roderick WALKER, Amin Habeeb Ullah a/k/a Franklin Neal, Romando Valeroso, Floyd W. Zeros, Ronald E. Thelen, Marvin Mayberry, Donald Sullivan, Dennis Spaulding, John T. Crown, Jerry Gonyea, David Lytal, Lewis Robinson, and Timothy Spytma, on Behalf of Themselves, and All Others Similarly Situated, Plaintiffs,

v.

Perry JOHNSON, Director, Michigan Department of Corrections; Barry Mintzes, Warden, State Prison of Southern Michigan; Dale Foltz, Warden, Michigan Reformatory at Ionia; Theodore Koehler, Warden, Marquette Branch Prison; Individually and in Their Official Capacities, State of Michigan, through the Michigan Department of Corrections, Defendants.

No. 81–40336.

United States District Court, E. D. Michigan, S. D.

June 21, 1982.

Larry W. Bennett, Birmingham, Mich., William Goodman, Judith Magid, Detroit, Mich., for plaintiffs.

Brian W. MacKenzie, Asst. Atty. Gen., Lansing, Mich., for defendants.

TABLE OF CONTENTS

I Introduction

II Factual Findings

(a) General Facts

(b) Factual Findings as to MBP

(c) Factual Findings as to SPSM

(c–1) Central Complex

(c–2) Northside Complex

(c–3) Trusty Division

(c–4) Summary and Effect of Restrictions

(d) Factual Findings as to Michigan Reformatory

III Legal Analysis

(A) Due Process Issue

(a) Major Misconduct and Administrative Segregation issue

(b) "Green Card" due process issues

(c) Summary of due process rulings

(B) Non-due process claims

(a) MBP claims

(b) SPSM claims

(b–1) Central Complex

(b–2) Northside Complex

(c–3) Trusty Division

(b–4) Summary of Non-procedural due process holdings as to SPSM

(c) Michigan Reformatory claims

IV Conclusion and Order

MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

I INTRODUCTION

This is a class action brought by all present and future persons confined at Marquette Branch Prison (MBP); the State Prison of Southern Michigan (SPSM); and the Michigan Reformatory at Ionia. The action arises in connection with a drastic reduction of prison activities—dubbed as a "lockdown" by the prison community—imposed as a result of riots that occurred at the three institutions in late May of 1981.

Plaintiffs challenge a variety of conditions now in effect at the three state prisons. Plaintiffs contend that certain classification procedures violate the Fourteenth Amendment guarantee of procedural due process. Plaintiffs also assert that various post-riot-living conditions at the three prisons are violative of the First Amendment,[1] the Eighth Amendment [2] and the equal protection clause. Plaintiffs seek injunctive relief requiring defendants [3] to restore prison conditions to the pre-riot level.

After a seven-week trial beginning on September 15, 1981 and ending on November 12, 1981, the Court took the case under advisement. Having considered the evidence and the law, the Court's findings of

---

[1] The First Amendment is relevant in this case with respect to prison restrictions against inmate religious activities. It should be noted, however, that since this is a 42 U.S.C. § 1983 action against state officials, the First Amendment is only applicable through its interpretation in the Fourteenth Amendment due process clause. *See Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1970). Similarly, the Eighth Amendment comes into play through due process incorporation. *See Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). For purposes of convenience and shorthand, the Court will refer to the due process clause incorporated First and

Eighth Amendments simply as the "First Amendment" and the "Eighth Amendment" throughout this opinion.

[2] *See* n.1 *supra.*

[3] Plaintiffs have four defendants in this action: One defendant is the Michigan Department of Corrections. The other three defendants, sued individually and in their official capacities, are: Perry Johnson, Director of the Michigan Department of Corrections; Barry Mintzes, Warden of Southern Michigan State Prison; Dale Foltz, Warden of the Michigan Reformatory at Ionia; Theodore Koehler, Warden of Marquette Branch Prison.

fact and conclusions of law are made herein.

## II FACTUAL FINDINGS

### (a) General Facts

On Friday afternoon, May 22, 1981, members of the Michigan Corrections Officers Association attempted to lock down inmates housed at Central Complex of SPSM. The lockdown was in direct contravention of the orders of SPSM Warden Barry Mintzes.

Faced with the prospect of a Memorial Day weekend lockdown, the Central Complex inmates began to riot. Shortly thereafter, rioting also broke out in Northside Complex. It is noted that many of the inmates in the two complexes did not participate in the rioting.

On Friday evening May 22, 1981, rioting broke out at the Michigan Reformatory, located in Ionia, Michigan. This riot erupted upon the Michigan Reformatory inmates learning of the SPSM rioting.

By May 23, 1981, SPSM and the Michigan Reformatory were in control of the prison authorities. The peace, however, was shortlived. On May 25, 1981 rioting again broke out at the Central and Northside Complexes of SPSM. This riot was marked by wholesale burning and looting throughout the two complexes.

On May 26, 1981, rioting broke out at MBP. This rioting, sparked by news of the rioting at SPSM and the Michigan Reformatory, resulted in significant property damage to MBP.

The three prisons were under control of authorities by May 27, 1981. Nevertheless, the riots, in addition to causing great property damage, profoundly affected the relationship between inmates and staff. Since the riots, there has been a palpable increase in tension and distrust between staff and inmates.

In the wake of the riots, drastic reductions in inmate privileges have been instituted. Moreover, the Court finds that there are no definite plans for the removal of the post-riot restrictions. Indeed, as plaintiffs point out, the post-riot conditions may well be a "new normal" for the prisons. The Court will now describe the post-riot conditions at each of the three prisons. The description will begin with MPB, proceed to SPSM and finish with the Michigan Reformatory.

### (b) Factual Findings as to MBP

In describing the factual conditions at MBP, the Court notes that in the aftermath of the riot, MBP has developed a new inmate security classification. The new classification is entitled "green card" status. An inmate may be assigned to green card status merely upon the finding that he has committed a major misconduct infraction. It is noted that the major misconduct infraction is, throughout the state prison system, also a basis for assignment to administrative segregation.[4] In a later portion of this opinion, the Court will consider the constitutionality of these major misconduct sanctions.[5]

In setting forth the facts as to the various challenged aspects of post-riot MBP prison life, we will begin with meal procedure. The Court finds that general population inmates currently are allowed to eat their three daily meals in the dining hall. The out-of-cell time provided in connection with meals amounts to about twenty-five to forty-five minutes per meal—approximately the same time allotment as before the riot. It should be noted, however, that the walk to and from the dining hall is more carefully regimented since the riot. Furthermore, the security within the dining hall is much more imposing since the riot. And finally, the Court notes that green card inmates are allowed to eat in the dining hall.

The Court finds that administrative segregation and punitive detention inmates are required to eat all of their meals within their cells. This is the same procedure that was followed prior to the riot.

---

**4.** *See* n.9 and accompanying text *infra.*

**5.** *See* nn.9–11 and accompanying text *infra.*

General population inmates currently are allotted about forty-five minutes per day of yard time. Prior to the riot, general population inmates were allotted between four and five hours of yard time per day.

Administrative segregation and green card inmates are allotted forty minutes per week of yard time. Prior to the riot, administrative segregation inmates were allotted between thirty and forty-five minutes per week of yard time.

It also is noted that sports equipment and recreation tables have been eliminated from the yard. Moreover, the running track within the yard has been significantly reduced in space.

General population inmates are allowed at least three showers per week. The showers last about five minutes, and the inmates are required to walk naked to and from the showers. Administrative segregation and green card inmates are allowed one shower per week.

Prior to the riot, general population inmates were allotted six showers per week, and administrative segregation inmates were allotted a mere one shower per week. The naked walk requirement was non-existent prior to the riot; the purpose of this rule is to protect guards against attack by inmates perpetrated with weapons hidden inside robes or towels.

Visitation privileges still are allowed up to three times per week at MBP. This is the same visitation allotment as before the riot.

Group religious services have been eliminated since the riot. Services are performed either by radio or by individual cell visits from a religious leader. Prior to the riot, inmates were allowed up to four or five hours of group prayers per week.

Approximately three hundred and thirty-six inmates presently are involved in either work or school assignments. Prior to the riot, about four hundred inmates were involved in either work or school assignments.

The law library has been made available on a detailed basis only. Inmates are allowed up to six hours per week of library access.

The Court finds that the above restrictions are very deleterious to the emotional welfare of MBP inmates. The denial of yard time generates rage, hostility and depression. The psychiatric testimony indicated that the prolongation of such reaction can lead to permanent psychoses.

The naked walk to the shower elicits a feeling of degradation and sexual humiliation. The naked walk also enhances the possibility of rapes and sexual attacks. Furthermore, the Court finds Warden Koehler's testimony incredible as to the fact that this particular measure is necessary for prison safety. Indeed, the safe walk objective could be accomplished in a less oppressive manner.[6]

The lack of group religious services denies the inmates a sense of togetherness in religious worship. Clearly, the loss suffered is not nearly as oppressive as the emotional damage mentioned above. Nevertheless, a palpable detriment flows to the inmates from the denial of group religious services.

The abridgment of library access has cut back on the inmates' ability to protect their legal rights. Obviously, this was not present in the instant case since the inmates were here represented by competent outside counsel. But with respect to other cases and legal matters, the library cutback works a hardship on MBP inmates.

(c) Factual Findings as to SPSM

(c-1) Central Complex

The meal procedures at Central Complex, like those at MBP, are similar to pre-riot times. Now—as before the riot—general population inmates are allowed to eat three meals per day in the dining hall. These meals, both now and before the riot, last between thirty and forty minutes. The chief differences indicate a more regimented post-riot walk to the dining hall and increased security within the dining hall.

6. *See* nn.55–56 and accompanying text *infra.*

Administrative segregation and punitive detention inmates eat their meals within their cells. This is the same practice that existed before the riot.

As to the yard time issue, the Court finds that general population inmates within Cell Blocks 3, 4, 5, 7 and 8 receive one hour of yard time per day. Prior to the riot, they received up to eight hours of yard time per day.

Administrative segregation inmates currently are allotted one half hour of yard time per every eight to eleven days. Prior to the riot, administrative segregation inmates were allotted one half hour per week.

Inmates in Cell Blocks 11 and 12[7] are allotted four hours of base yard time[8] per day, but are not allotted outside yard time. Prior to the riot, inmates in cell blocks 11 and 12 were given seven hours of yard time per day. The Court also notes that sports equipment has been eliminated from the yard of Central Complex.

Inmates in Cell Blocks 3, 4, 5, 7 and 8 are allowed to shower only in lieu of a yard period or a meal. Prior to the riot, they were not compelled to forego yard time or a meal in order to shower.

Inmates in administrative segregation are allotted one shower per every eight to eleven days. Prior to the riot, administrative segregation inmates were allowed one shower per week.

Inmates in Cell Blocks 11 and 12 are allowed to shower during base yard time. Prior to the riot, they could shower whenever they were not in their cells.

Central Complex inmates are allowed four visits per month. This is the same visitation allotment as before the riot.

Central Complex inmates are allowed one hour of group religious services per week. Prior to the riot, Central Complex inmates were allowed several hours per week of religious counseling and group study in addition to the weekly services.

There has been a significant reduction of Central Complex law library time. Inmates are allowed a maximum of two hours of law library time per week. In addition, access to jailhouse lawyers has been severely restricted. Prior to the riot, inmates were allowed up to eleven hours per week of library access. Furthermore, inmates were allowed much freer access to jailhouse lawyers.

The statistics and exhibits as to work and school assignments are inaccurate and imprecise. Nevertheless, the Court finds that there has been a significant reduction of such assignment with respect to Central Complex inmates.

(c–2) Northside Complex

Northside general population inmates currently eat their meals in the dining hall. The meals result in approximately thirty to forty minutes per day of out-of-cell time. This is equivalent to the meal procedures followed prior to the riot.

Unassigned Northside inmates are allotted three and one half hours of yard time per week. If an unassigned inmate chooses to go into the yard, he must stay there for the entire yard period. Assigned Northside inmates are allotted one half hour of yard time per day.

Prior to the riot, all Northside general population inmates were allotted at least four hours per day of yard time. In addition, Northside inmates were allowed a "base yard" option that has now been eliminated. The Court also finds that sports equipment has been removed from the Northside Complex yard.

Northside day assignment inmates may shower only during yard period. Unassigned Northside inmates are allotted showers on a daily gallery basis. The effect of this arrangement is that unassigned inmates often are allowed to take but one shower per week.

---

7. It should be noted that cell blocks 11 and 12 are honor blocks.

8. Base yard is where inmates are allowed to congregate on the floor of the cell block and engage in various activities.

The shower facilities are often in need of repairs; this has lent to cancellation and shortening of shower periods. Prior to the riot, all Northside general population inmates were allowed one shower per day.

Northside inmates are allowed five visitations per month. Prior to the riot, Northside inmates were allowed six visitations per month.

Muslim inmates at Northside Complex are allowed three hours per week of religious services. These inmates were allowed seven hours of religious services per week prior to the riots.

The Warden's Forum, an important inmates' representative organization, has been cut back in scope since the riot. Drama workshop and music activities have been eliminated at Northside in the wake of the riot.

There has been a definite decrease in the number of inmates participating in school and work assignments. But here, as with Central Complex, the Court is unable to even approximate the number of affected inmates.

Nevertheless, inmates have suffered a significant decrease in law library time since the riots. Prior to the riots, Northside inmates were allotted between twelve to fifteen hours of law library time per week. Since the riot, inmates often are restricted to one hour a week of law library time. The maximum post-riot time allotment enjoyed by any Northside inmate has been four and one half hours.

### (c–3) Trusty Division

Since the riot, Trusty inmates are allotted two hours per day of outdoor yard time, and three hours per day of base yard time. Prior to the riot, trusty inmates received up to eleven hours per day of outside yard time.

Since the riot several extra curricular organizations of Trusties no longer function. Aside from the above, the Court finds no even arguably significant unconstitutional restrictions at Trusty Division.

### (c–4) Summary and Effect of Restrictions

The Court finds that the relevant restrictions and the concomitant effect as to MBP inmates are parallel to the effects suffered by Central and Northside Complex SPSM inmates. Therefore, the Court incorporates its earlier discussion as to the effects of decreased yard time, religious services and law library access. The Court also finds that the lack of adequate shower arrangements has the effect of subjecting Northside inmates to diseases that are caused by lack of appropriate hygiene.

### (d) Factual Findings as to Michigan Reformatory

Michigan Reformatory general population inmates eat three meals per day in the dining hall. This, of course, is the same practice as before the riot. Unassigned Michigan Reformatory inmates are allotted yard time two and three times a week for forty-five minutes per each time in the yard. Assigned inmates are allotted yard time when yard time is available to unassigned inmates. Furthermore unassigned inmates are allotted an additional twenty-minute stretch of yard time four times per week. The Court also finds that weight lifting and handball have been eliminated as yard time activities.

Prior to the riot, both assigned and unassigned inmates were allotted two hours of yard time per day. The two hours were in two separate one-hour intervals.

The Court notes that the religious activities of Michigan Reformatory Muslims have been restricted significantly since the riot. Muslim inmates now are restricted to a one-hour service held every Sunday. Prior to the riot, Muslim inmates were allowed a ninety-minute week night religious service in addition to the weekend service. Furthermore, prior to the riot, Muslim inmates were allowed to listen to radio services and be visited in their cells by Imams.

Michigan Reformatory inmates are now restricted to one hour of law library per week. Furthermore, inmate access to jail-

house lawyers has been reduced. Prior to the riot, Michigan Reformatory inmates were allowed up to ten hours per week of law library time. Furthermore, prior to the riot, inmates enjoyed relatively-free access to jailhouse lawyers.

There has been a definite reduction in the number of job assignments since the riot. The Court cannot, however, make a precise determination as to the number of jobs that have been eliminated.

The Court finds that yard time, religious activities and law library restrictions on Michigan Reformatory inmates produce the same kind of effects described in the pertinent parts of the Court's fact findings section as to MBP. Therefore, the Court finds that the post-riot restrictions basically have elicited the same effects with respect to the three prisons.

## III LEGAL ANALYSIS

### A. Due Process Issue

#### (a) Major Misconduct and Administrative Segregation Issue

In analyzing the various due process issues, the Court will first consider the issues arising out of the Michigan Department of Corrections rule that allows an institution to assign a prisoner to administrative segregation merely upon the finding that the prisoner has committed a major misconduct violation.[9] Clearly, the Department rule raises a liberty interest and concomitant

procedural guarantees.[10] The extent of these procedural guarantees will be dealt with later in this opinion. But plaintiffs also contend that the very nature of this rule offends *substantive* due process in the sense that the state should be required to prove more than a mere major misconduct violation prior to subjecting a prisoner to the grievous loss of freedom that inheres in administrative segregation.

The Court must point out that the two important recent Sixth Circuit prisoner cases dealing with the subject of due process cut against plaintiffs' contention. The most recent of these cases is *Bills v. Henderson.*[11] The first section [12] of the *Bills* opinion is concerned chiefly with the issue of when a liberty interest is triggered in the administrative segregation assignment context. Nevertheless, it must be noted that the first section of *Bills* is permeated with the idea that a correctional authority possesses the power to establish the kind of conduct that will invoke the administrative segregation sanction.[13]

The other Sixth Circuit case—*Walker v. Hughes*[14]—is even stronger inferential support for the constitutionality of the major misconduct rule at issue in the present case. *Hughes*—cited approvingly at several places in the *Bills* opinion [15]—dealt with the issue of whether a liberty interest was created by a correctional authority rule that provided that an inmate could be assigned to administrative segregation upon the finding of a major misconduct violation.

---

**9.** Administrative segregation for major misconduct was not really established by a duly promulgated "rule." Instead, the sanction was established by a policy memorandum circulated on February 1, 1980 by Perry M. Johnson, the director of the Michigan Department of Corrections. *See* appendix to docket entry # 62 in the file.

The memorandum, however, has the effect of a rule in that it establishes the credibility of the administrative segregation sanction with respect to the prison and administrator and the expectancy of the sanction with respect to inmates. Therefore, throughout the opinion, the Court will use the shorthand term "rule" to refer to the policy memorandum.

**10.** *See Bills v. Henderson,* 631 F.2d 1287 (CA 6, 1981). *Bills* held that statute, policy directives and regulations can create a liberty interest

with respect to administrative segregation assignment. An inmate enjoys a liberty interest in that he cannot be assigned to administrative segregation unless he warrants such assignment on the basis of conduct specified in the statute, policy directive or regulation. *See id.* at 1291–4.

**11.** 631 F.2d 1287 (CA 6, 1981).

**12.** *See id.* at 1291–94. *See also* n.10 *supra* for a summary of the first section of *Bills.*

**13.** *See generally id.* at 1291–94.

**14.** 558 F.2d 1247 (CA 6, 1977).

**15.** *See e.g.,* 631 F.2d 1287, 1291, 1292.

That is to say that the rule at issue in *Hughes* was the same kind of rule that now is attacked by plaintiffs. If the Sixth Circuit had agreed with the position advanced by the present plaintiffs, it would not have had to consider whether appropriate procedural safeguards were extended in connection with the application of this rule. Instead, the Court could have—and should have—struck the rule down on a substantive due process theory. That the *Hughes* court did not do so is a clear sign that it did not view the rule as violative of substantive due process.

Plaintiffs, however, rely on the Supreme Court case of *Vitek v. Jones*[16] as support for this substantive due process theory. *Vitek* held that the transfer of a prisoner from a prison to a mental hospital must be accompanied by adequate procedural safeguards. While recognizing that plaintiff enjoyed a liberty interest created by a prison rule,[17] the Court also noted that the assignment to a mental hospital from a prison is such a grievous loss that, even absent a state law or prison regulation, the prisoner's "residuum of liberty" is violated.[18]

*Vitek* may or may not be significant in the field of procedural due process in light of the Supreme Court's explicit recognition that there is a "residuum of liberty" that is beyond and supplemental to the liberty interests created by laws and regulations; but plaintiffs err in their assertion that *Vitek* provides strong support for an attack on the very existence of the major misconduct rule. This conclusion follows from two basic facts: First, it must be pointed out that *Vitek* may well be more concerned with procedural due process than substantive due process. The *Vitek* "residuum of liberty" discussion occupies approximately two pages of the court's opinion.[19] While it is true that at a few places in the discussion, the court seems to indicate that a mental hospital assignment is *per se* unconstitutional, most of the two-page discussion—including the conclusion—deals with the thesis that the state must accord adequate procedural safeguards prior to making the mental hospital assignment.

Furthermore, this Court is constrained to point out that plaintiffs have far overrated the scope of the *Vitek* "residuum of liberty" discussion. At first glance the "residuum of liberty" phrase seems to open wide new vistas of liberty interests. Upon further examination—at least in this Court's viewpoint—it can be seen that *Vitek* is addressed to nothing more than mental hospital reassignments. In this respect, attention is called to the following statement made by the Court in *Vitek* : "Undoubtedly a valid criminal conviction and prison sentence extinguish a defendant's right to freedom from confinement ... Such a conviction and sentence sufficiently extinguish a defendant's liberty 'to empower the State to confine him in any of its prisons ...' It is also true that changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him.' " [20]

The *Vitek* court then went on to distinguish the mental hospital reassignment from other aspects of confinement.[21] This Court thus views *Vitek* as a narrow holding pertaining to mental hospital assignment rather than intra-prison assignment. Therefore, the Court holds that *Vitek* does not invalidate the major misconduct rule. Indeed this Court rejects plaintiffs' attack on the substantive aspect of this rule.

The next question is what specific procedural guarantees must be provided in connection with a transfer to administrative segregation where the plaintiff has commit-

**16.** 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).

**17.** *See id.* at 488, 489, 100 S.Ct. at 1261.

**18.** *See id.* at 491–494, 100 S.Ct. at 1262–1264.

**19.** *See id.* at 492–493, 100 S.Ct. at 1263.

**20.** *See id.* at 493, 100 S.Ct. at 1263.

**21.** *See id.* at 493–494, 100 S.Ct. at 1263–1264.

ted a major misconduct violation. It should be noted that there is a Michigan statute that sets out various procedures to be followed in prisoner hearings.[22] But as plaintiffs concede, *Bills* squarely holds that the due process clause does not require a state to adhere to its own procedural safeguards where the state is depriving a prisoner of a liberty interest recognized by the federal Constitution.[23] Thus, this Court must look to federal constitutional common law in determining whether the state's procedures comport with the due process clause. These relevant portions of this body of law were reviewed and applied in section II of *Bills*[24], a section that is of great importance in resolving the major misconduct procedural issue.

■ The fact that a major misconduct violation is comprised of a set of specific facts is significant because *Bills* distinguishes administrative segregation as a punishment for a specific infraction from administrative segregation in response to general predictive behavior and past record. In the former case, *Bills* holds[25] that the applicable procedures are those that were first set out of the Supreme Court in *Wolf v. McDonnel*[26]—a "good time" credit revocation case. Since a specific infraction is the reason for the major misconduct administrative segregation sanction, this Court holds that the *Wolf* safeguards[27] must be extended to inmates who are transferred to administrative segregation as a sanction for major misconduct. The Court will now enumerate the procedures that are mandated under *Wolf*.

The first *Wolf* requirement deals with notice. As applied to the instant case, the Court holds that an inmate must be informed in writing of the nature of the major misconduct charge at least twenty-hours prior to the hearing on said charge.

In emergency situations, an inmate may be placed in administrative segregation for up to four days prior to notice and hearing, but, in any event, the notice—at a minimum must be given twenty-four hours prior to the hearing.

Next, under *Wolf*, the inmate must be allowed to call witnesses and produce documentary evidence unless—under an objective test—it would be unreasonably dangerous to institutional safety to allow the inmate to proceed in this manner. And finally, defendant must be provided with a written statement setting out the reasons behind the decision to impose the administrative segregation sanction.

Having recited the *Wolf* requirements, they must now be applied to the major misconduct procedures currently utilized. The parties have stipulated that inmates currently receive written notice of the major misconduct with which they are charged. This notice must be expanded to provide a thorough statement of not only the particular offense charged, but the factual basis of the charge. Furthermore, the notice must clearly inform the inmate that he will be subject to administrative segregation upon conviction of the major misconduct charge.

Presently, the inmate is "notified" of the administrative segregation sanction by the statement in the resident guidebook indicating that an inmate is subject to reclassification upon a finding of a major misconduct. Although the resident guidebook is distributed to inmates upon entry into prison, the guidebook notice is not enough to satisfy the *Wolf* notice requirements. Instead, the prison must assure that the major misconduct notice contains a statement of the administrative segregation sanction that the inmate faces upon conviction.

---

**22.** *See* M.C.L.A. § 791.252.

**23.** *See generally,* Section III of *Bills,* 631 F.2d 1287, 1296–1299.

**24.** *See* 631 F.2d 1294–96.

**25.** *See id.* at 1295–96.

**26.** 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**27.** The *Wolf* safeguards are set out by the Supreme Court at pp. 559–568, 94 S.Ct. at pp. 2976–2980 of the *Wolf* opinion.

The stipulation supplied by the parties indicates that inmates currently receive a written statement summarizing the factual finding relevant to the major misconduct. As long as this statement with reasonable thoroughness reviews the evidence, it is within the *Wolf* hearing requirement, and thus satisfies procedural due process.

Having set out the requirements that defendants must follow, it may be instructive to summarize briefly the contentions of plaintiffs that this Court has rejected. Plaintiffs have argued that it is unconstitutional for the major misconduct hearing to be confined to evidence that relates solely to guilt or innocence of the major misconduct charge. Plaintiffs contend that other evidence should be admitted prior to the imposition of the administrative segregation sanction. This evidence, according to plaintiffs, should include mitigating circumstances surrounding the event; past behavior; the isolated nature of the act and other evidence that is relevant to the general question of whether the inmate deserves the draconian administrative segregation punishment.

■ The Court incorporates by reference its earlier discussion regarding the issue of whether substantive due process precludes the assignment of an inmate to administrative segregation upon the mere finding of a major misconduct violation.[28] As has been indicated, such an assignment is not violative of substantive due process. In turn, there is nothing procedurally infirm about a hearing that is restricted to evidence solely relating to the issue of whether the inmate really committed the major misconduct violation. Both *Bills, supra* and *Hughes, supra* indicate that the taking of such evidence is appropriate; furthermore, these decisions contain absolutely nothing that indicates that the circumstances set out by plaintiffs must also be examined at the hearing.

It follows also that plaintiffs' demand for a second hearing on the issue of administrative segregation also must be rejected.

Plaintiffs would have this Court order the state to provide for a second hearing on the administrative segregation sentence in addition to the first hearing on the issue of whether the inmate has committed a major misconduct infraction. This argument crumbles once it is established that the due process clause does not prevent the state from transferring an inmate to administrative segregation merely upon a major misconduct finding. Once the state has incorporated the *Wolf*, procedures into the major misconduct hearing, the state has satisfied the procedural due process requirement as enunciated in *Wolf* and *Bills*.

### (b) "Green Card" Due Process Issues

In analyzing the green card issue, the Court refers to its earlier factual findings on the nature of green card status and administrative segregation status. Again, it is emphasized that green card inmates are locked in their cells nearly twenty-one hours per day. They have no job nor school assignments; they are entitled to one shower per week. Taking all of this into account, the Court concludes that green card status is equivalent to administrative segregation status. The differences between the two classifications—such as the green card inmates' right to eat in the dining hall—are de minimus.

The basic issue of law with respect to the green card classification is whether the state can dilute or avoid the procedural safeguards that attach to administrative segregation classification by renaming this classification as "green card" classification. The Court will now analyze the two forms of attack that have been launched against the green card status procedures.

■ Plaintiffs first contend that the administrative segregation assignment amounts to such a grievous loss that it *per se* raises a due process liberty interest. Drawing from *Wright v. Enomoto*[29] and

---

**28.** *See* nn.11–21 and accompanying text *supra.*

**29.** 462 F.Supp. 397 (ND Cal, 1976) aff'd, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756.

*Vitek v. Jones*[30], plaintiffs assert that there is a "residuum of liberty" that cannot be invaded absent adequate procedural safeguards. It must be emphasized that, under this theory, a procedural due process liberty interest is raised absent any rules, regulations or other expectancy created by the state. Earlier in this opinion, the Court discussed the residuum of liberty concept in connection with a substantive due process theory.[31] Here, the residuum of liberty theory arises in connection with a procedural due process theory.

Plaintiffs place principal reliance on *Wright v. Enomoto, supra*. In *Wright*, a three-judge panel sitting as a district court for the Northern District of California, held that plaintiff inmates were deprived of liberty without due process when, without *Wolf* procedures, the inmates were assigned to administrative segregation.[32]

The *Enomoto* court set out two separate bases for its holding. Pointing to a specific California Department of Corrections rule that enumerates specific reasons for which an inmate was to be assigned to administrative segregation, the Court held that the rule gave rise to a liberty interest that protected an inmate from assignment to administrative segregation absent a finding that his conduct fell within one of the enumerated administrative segregation reasons.[33] This analysis, of course, is very similar to the *Bills* section I analysis[34], and is fully consistent with this opinion.

But *Enomoto* also found that a liberty interest had been created by the mere assignment to the "grossly more onerous"[35] administrative segregation classification. Such an assignment, according to the *Enomoto* court, impairs an inmate's residuum of

liberty and thus raises a due process liberty interest.[36]

Plaintiffs put great emphasis on the fact that *Enomoto* was summarily affirmed by the United States Supreme Court, and is thus "binding authority" on lower courts. This Court believes, however, that plaintiffs err in asserting that the residuum of liberty concept is binding in the administrative segregation context as a result of *Enomoto*.

If plaintiffs' position were correct, the Sixth Circuit liberty discussion in section I of *Bills* would be superfluous. There would have been no need for the *Bills* court to decide whether Tennessee prison regulations created a liberty interest. Mere recognition that the inmates were assigned to administrative segregation would have been enough to raise a liberty interest.

But the *Bills* opinion leaves the overwhelming impression that a state must affirmatively create a liberty interest. *Enomoto* is cited in *Bills* for the proposition that prison policy statements may create a liberty interest.[37] Nowhere in *Bills* is there a mention that there is a residuum of liberty that automatically is triggered by assignment to administrative segregation.

Thus, the inescapable conclusion is that the Sixth Circuit read the Supreme Court's affirmance of *Enomoto* as binding authority with respect to the basic holding that state rules and regulations in regard to administrative segregation create a liberty interest that must be accompanied by *Wolf* procedural safeguards. The Sixth Circuit did not, however, accord precedential weight to the *Enomoto* residuum of liberty discussion. This discussion apparently was viewed as dicta by the Sixth Circuit. Simi-

**30.** 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).

**31.** *See* nn.11–21 and accompanying text *supra*.

**32.** *See* 462 F.Supp. 397, 402–403.

**33.** *See id.* at 402–405.

**34.** *See* 631 F.2d 1287, 1291–94.

**35.** *See* 462 F.Supp. 397, 402.

**36.** *See id.*

**37.** *See* 631 F.2d 1287, 1293. In this respect, it also should be noted that in *Vitek v. Jones*, the Supreme Court cited *Wright* for the proposition that state statutes can create a liberty interest with respect to the administrative segregation classification. *Wright* was *not* cited in the *Vitek* residuum of liberty discussion. *See* 445 U.S. 480, 491–93, 100 S.Ct. 1254, 1262–1263, 63 L.Ed.2d 552.

larly, this Court cannot be bound by the residuum of liberty discussion in *Enomoto*. Absent a further indication by the Sixth Circuit or Supreme Court, the *Enomoto* residuum of liberty discussion must be viewed as non-binding dicta. (Although the concept of a residuum of liberty is attractive and may indeed be a valid theory in the future, the Court must leave that for future development.)

Similarly, the Court rejects plaintiff's use of *Vitek* as support for the residuum of liberty theory. As was indicated earlier, *Vitek* was carefully crafted to apply to nothing more than the mental hospital assignment interest.[38] It would, therefore, be an utterly unwarranted extension to interpret *Vitek* as supportive of the theory advocated by plaintiffs. In sum, the Court rejects plaintiffs' contention that a procedural due process liberty interest automatically is triggered once plaintiffs are assigned to administrative segregation.

Plaintiffs' second contention is that a state cannot by legal fiction avoid the constitutional obligation to accord *Wolf* procedures to green card misconduct hearings. This contention is much stronger than the residuum of liberty theory.

In this respect, the Court can point to a number of prison-related cases in support of the thesis that the renaming tactic is unlawful.[39] The Court would also assert that the school desegregation cases are lucid examples that it is unjust and constitutionally futile for a state to attempt to erode a constitutional obligation by engaging in renaming fictions. Indeed, for many years after the famous *Brown v. Board of Education*[40] decision, a number of states attempted to thwart the equal protection clause mandate of *Brown* by concocting different names for practices that were the same or nearly the same as segregation.[41] It is well known that the federal judiciary invalidated these practices.[42] Similarly, the present Court will not allow the state to deprive plaintiffs of the liberty interest created by the administrative segregation rules by renaming administrative segregation as "green card" status.

In light of the above, the Court finds that inmates assigned to green card status must be accorded the same procedural rights as the inmates assigned to administrative segregation. Accordingly, the Court incorporates by reference its holding in part III(a) of this opinion in which the Court set out the *Wolf* procedural requirements as applied to the administrative segregation sanction for major misconduct. The Court holds that these requirements also must be accorded to inmates who are assigned to green card status.

The Court also notes that green card status is a punishment imposed as a result of a major misconduct violation. For the reasons discussed in Part III(b) of this opinion, the Court holds that there is nothing unconstitutional about this punishment for a mere misconduct violation. Furthermore, the Court notes that only one hearing, with evidence restricted to the issue of whether a major misconduct violation has occurred, is all that is required under this Court's order.

In essence, it can be seen that the Court is ordering defendants to treat the green card status in the same manner procedurally as the administrative segregation status. It remains, however, to consider one last issue in connection with the green card status.

At the present time, green card inmates—unlike administrative segregation inmates—are not extended monthly reviews

**38.** *See* nn.17–20 and accompanying text *supra*.

**39.** *See e.g., Carlo v. Gunter,* 520 F.2d 1293, 1295 (CA 1, 1975); *Walker v. Mancusi,* 467 F.2d 51 (CA 2, 1977).

**40.** 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

**41.** *See* Emerson, Haber and Dorsen, *Political & Civil Rights in the United States,* Chapter 15 (1964). *See also* Bell, *Race Relations & American Law,* Chapter 9B (1973).

**42.** *See Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Alexander v. Holmes County Board of Education,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

to determine whether the necessity for green card status still exists. In determining whether this lack of review is constitutional, this Court again acknowledges that section III of *Bills*[43] asserts clearly that the procedural component of the due process clause does not require a state to adopt its own promulgated procedures in connection with protecting plaintiffs' federal constitutional liberty interest. On the other hand, the section III *Bills* discussion is addressed to the problem created by requiring a "large volume of state proceedings"[44] in prison and other settings. This Court believes that it is within the general spirit of *Bills* to require the state to accord monthly reviews of the green card inmates. These reviews shall parallel the monthly reviews now accorded to administrative segregation inmates.[45]

The Court would emphasize the narrowness of the monthly review holding. The monthly review is a part of the procedures mandated by the due process clause in the instant case. This Court is not holding that the monthly review must necessarily be added to the *Wolf* procedures in all federal court cases. The Court only holds that, since Michigan procedures already mandate monthly reviews in the administrative segregation context, such reviews must also be extended to the green card status. Therefore, the Court will order that Marquette Branch Prison must extend monthly reviews to determine whether green card status is still appropriate for a given inmate. In addition, of course, MBP must bring its green card hearing procedures in line with the *Wolf* requirements.

### (c) Summary of Due Process Rulings

In accordance with part III(A)(a), (b) of this opinion, the Court hereby ORDERS defendants to bring their procedures in line with the following: With respect to major misconduct violations that are punished by administrative segregation, defendants must (first), conduct a hearing on the issue of whether the inmate committed the major misconduct violation and provide to the inmate at least twenty-four hours prior to the hearing, a written notice of the hearing stating the nature of the charges, and the factual basis of the charge; (second), allow the inmate to call witnesses and produce documentary evidence unless it reasonably appears that it would be overly dangerous to institutional safety to allow the inmate to proceed in this manner; and (third), a written statement setting out the reason behind the decision to impose the administrative segregation sanction.

With respect to the green card status, defendant MBP is hereby ORDERED to implement the *Wolf* procedures set out above. Furthermore, MBP is ordered to provide monthly reviews of green card status similar in procedure to the monthly administrative segregation reviews now held under Michigan Department of Corrections Administrative Rule R.791.4405.

### (B) Non-Due Process Claims

Plaintiffs have advanced a variety of nonprocedural due process claims. The vast majority of these claims are based on the Eighth Amendment. In addition, however, plaintiffs have added claims based on the free exercise of religion clause of the First Amendment and on the equal protection clause's fundamental right to access to the courts.

In analyzing the Eighth Amendment claims, it is acknowledged that the legal standards with respect to individual issues are not as easy to ascertain and apply as in the procedural due process area. Nevertheless, in *Rhodes v. Chapman*,[46] the Supreme Court set out a general analytic principle that is of value in Eighth Amendment pris-

---

**43.** *See* 631 F.2d 1287, 1296–99.

**44.** *See* 631 F.2d 1287, 1299.

**45.** In other words, the monthly green card status review should be similar to the reviews described in Michigan Department of Correc- tions Administrative Rule R.791.4405, the rule that deals with the monthly Administrative Segregation reviews.

**46.** 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

on-related cases. The *Rhodes* Court indicated that an Eighth Amendment claim is stated where an inmate is made to suffer unnecessary and wanton pain or where a punishment is grossly disproportionate to the severity of the crime.[47] The Court also asserted that punishments "totally without penological justification" are included within the span of "unnecessary and wanton pain" punishments.[48]

Armed with the *Rhodes* general principle plus a variety of decisions from other federal courts,[49] the Court will evaluate plaintiffs' Eighth Amendment claims which are aimed at a wide variety of practices occurring at the three prisons.

(a) MBP Claims

The first MBP Eighth Amendment issue to be considered is whether there is something in the MBP post-riot meals procedure that is unconstitutional. As was noted in the factual findings section of this opinion, the chief post-riot dining changes are that the walk to the dining hall is subject to stricter regimentation and, within the dining hall, security is much more imposing.

Clearly, the changes in dining regimentation are not even close to being valid Eighth Amendment claims. The increased regimentation does not produce wanton and unnecessary pain. Furthermore, dicta in *Chapman* indicates that dining-related Eighth Amendment claims should be addressed to the quantity or quality of essential food.[50] Plaintiffs simply have not stated basic deprivation as to food. Therefore, the Court rules that plaintiffs have not sustained an Eighth Amendment claim with respect to dining-related issues at MBP.

Next to consider is the issue of yard time. Again, the Court incorporates by reference its earlier discussion of the amount yard time has been reduced and the psychological effect this reduction has had on inmates.

The Court finds that the psychological damage occasioned by the reduction in yard time does amount to the infliction of unnecessary and wanton pain forbidden by *Rhodes*. It is one thing for MBP to reasonably reduce yard time in response to the riot, but it is quite another for the prison to undertake this drastic a reduction of so critical an aspect of an inmate's life.

The Court also notes that other recent federal decisions have marked drastic reductions of yard time a cruel and unusual punishment under the *Rhodes* analysis.[51] While it is not possible for this Court to calibrate precisely[52] the amount of yard

47. *Id.* at 452 U.S. at 348, 101 S.Ct. at 2399.

48. *See id.*

49. *See e.g., Ruiz v. Estelle*, 679 F.2d 1115 (CA 5, 1982); *Ramos v. Lamm*, 639 F.2d 559 (CA 10, 1980); *Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980). *See also Hendrix v. Faulkner*, 525 F.Supp. 435 (ND Ind. 1981); *Lightfoot v. Walker*, 486 F.Supp. 504 (SD Ill. 1980); *Johnson v. Levine*, 450 F.Supp. 648 (DC Md. 1978).

50. *See* 452 U.S. at 348, 101 S.Ct. at 2398. *See also Ramos v. Lamm,* 639 F.2d 559 (CA 10, 1980). The *Ramos* court enunciated the following principle that succinctly states the constitutional minimum as to prison food: "[The state must provide] nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *See id.* at 570–71.

51. *See e.g., Ruiz v. Estelle*, 679 F.2d 1115 (CA 5, 1982); *Hendrix v. Faulkner*, 525 F.Supp. 435 (ND Ind., 1981). It also should be noted that there is an argument—apart from a psychologi-

cal abuse—that there is a physical need for exercise that cannot be ignored without violating the Eighth Amendment. This is a supplemental argument in favor of plaintiffs' position on the yard time issue. *See Miller v. Carson*, 563 F.2d 741, 747–50 (CA 5, 1977); *Nadeau v. Helgemoe*, 561 F.2d 411, 420 (CA 1, 1977); *Kirby v. Blackledge*, 530 F.2d 583, 386–87 (CA 4, 1976). *See also Ahrens v. Thomas*, 434 F.Supp. 873, 398 (WD Mo, 1977).

52. It is well known that precision as to harm and remedy is not possible in prison reform cases. *See Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (concurring opinion of Justice Brennan). But this must not prevent federal courts from safeguarding the constitutional rights of inmates.

The Court would also note that the federal judiciary should not be restrained from acting in a prison case merely because the letter of the Eighth Amendment does not apply to specific modern prison practices. It is enough that the courts can point to the cruel and unusual punishment principles embedded in the Eighth

time that will reduce psychological pressure to a permissible level, the Court finds that MBP inmates must be provided with significant yard time increase over the present yard time allotment.

■ Presently, general population inmates receive five to six hours of yard time a week. The Court hereby rules that the general population inmates must be accorded two hours per day of yard time. This retains the punishment of reducing yard time from the five-hour-a-day level existing prior to the riot, but it also raises yard time to a constitutionally acceptable level.

Administrative segregation inmates now receive thirty to forty minutes of yard time per week. The Court finds that it cannot avoid ordering MBP to once again provide Administrative Segregation and Green Card inmates with thirty to forty minutes per day of yard time. Absent this level, the wanton pain forbidden by *Rhodes* almost inevitably occurs.

In ordering MBP to increase the amount of yard time, this Court has not lost sight of the Supreme Court's *Wolfish* admonition [53] that federal courts should accord great deference to the decisions of state prison administrators.

While the Court has evaluated this case giving deference to the state administra-

tor's decisions, there is a constitutional level beyond which punishment may not extend. As to yard time, MBP has violated bare constitutional minimums. Therefore, the Court must order MBP to provide additional yard time.

■ On the other hand, the Court must reject plaintiffs' request that sports equipment and recreational tables be restored to the prison yard. As a matter of personal policy this Court indeed believes that the restoration of such equipment is desirable. But this Court's personal policy predilections must not carry the day.[54] Instead, the Court must only act where the Constitution has been violated. Clearly, the denial of the sports equipment and recreational tables does not engender the wanton pain that amounts to an Eighth Amendment violation. And thus the Court cannot order the state to replace this equipment.

Plaintiffs next contention pertains to shower allotments. In ruling on this claim, the Court incorporates by reference its recitation of factual findings with respect to shower allotments.

■ The Court finds that the present shower allotment is not unconstitutional. In *Rhodes*, the Court indicated that sanitation is an important concern.[55] Yet this Court cannot assert that the present shower

Amendment. From this principle, courts can infer whether a modern prison practice is constitutional. In other words, by honest interpretivist methods, a federal judge can zealously protect constitutional rights in prison-related litigation. *See generally* Grano, *Judicial Review & A Written Constitution In A Democracy*, 28 *Wayne L Rev* 1, 62 (1982); Tribe, *American Constitutional Law*, 454–455 (1978).

**53.** *See Bell v. Wolfish*, 441 U.S. 520, 542, 99 S.Ct. 1861, 1875, 60 L.Ed.2d 447 (1982).

**54.** There is, of course, a school of thought that would allow the judiciary to intervene in human rights cases even where the judicial intervention could not honestly be connected to a value embedded within the Constitution. This philosophy—which has been dubbed as "non interpretarian"—would justify a wide range of judicial policy making under the rubric of either the equal protection clause or the due process clause.

Non interpretavism has been brilliantly portrayed and defended in the writings of Profes-

sor Michael Perry. *See, e.g.,* Perry, *Non Interpretive Review in Human Rights Cases*: 9 *Functional Justification*, 56 NY U L Rev, 278 (1981); Constitutional "Fairness": *Notes on Equal Protection & Due Process*, 63 Va L Rev 383 (1977). And it cannot be denied that there is much to be said in favor of this philosophy.

But it also cannot be denied that this Court is guided by Sixth Circuit and Supreme Court precedents—and not by law review articles. At the present time, non-interpretavism is nothing more than an idea debated in scholarly literature and is thus not entitled to serious practical consideration by a lower court. Instead, this Court is bound by the limits and dicta inferable from the Eighth Amendment. These limits and dicta preclude this Court from interfering with many of the post-riot restrictions at the three state prisons in question.

**55.** *See* 452 U.S. 337, 348, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59.

allotment is a serious threat to personal sanitation. Therefore, the Court will not order the prison to increase shower allotments.

On the other hand, the Court must strike down the requirement that prisoners must walk naked to and from showers. Obviously, such a practice is embarrassing to the inmates. Moreover, this Court finds that there is no real penological justification for the nakedness requirement. Warden Koehler has indicated that the requirement protects against assaults to and from the shower room. This Court finds, however, that a search of the robes warn by the inmates en route to the shower room would adequately protect against such assaults. Therefore, the prison is ORDERED to allow inmates to wear a robe or other appropriate attire on the walk to the shower. Again, the Court notes that, prior to the walk, the attire worn by the inmates could be thoroughly searched.

In moving on in its analysis, the Court finds that visitation privileges are essentially the same as prior to the riot: The three-hour-a-week visitation rule clearly comports with the Constitution [56] and need not be considered further.

 As for the prison's elimination of "special activities," the Court must hold that this is without constitutional significance. The Eighth Amendment must be limited to fact patterns where basic essential needs have been restricted. Such restrictions did not occur with respect to the special activities.

As to plaintiffs' claim that work and school assignments have been reduced in violation of the Eighth Amendment, it is noted that it was found as facts that the work and school assignments have been cut in half with respect to the number of participating inmates.

Plaintiffs argue that this is an unconstitutional restriction of rehabilitation. But plaintiffs neglect to consider the following passage from the *Rhodes* opinion: "limited work hours and delay ... do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments." [57]

 This Court disagrees with much of the content of the *Rhodes* statement. Again, however, this is not the point. The point is that, in light of the statement, this Court cannot find that the work and school cutbacks violate the Eighth Amendment. Therefore, the Court will not order MBP to resume pre-riot work and school assignments.

Consideration next is to be given to the claim that MBP has violated plaintiffs' equal protection clause right to meaningful access to the courts as established in the Supreme Court case of *Bounds v. Smith*. [58]

 The Court incorporates by reference the factual findings on this issue, and is compelled to agree with plaintiffs. While the Court acknowledges that the MBP library is adequate, the Court finds that MBP has unlawfully restricted access to the library.

The Court thus ORDERS MBP to restore library access to the pre-riot level. The library can remain available on a detail basis only, but the amount of detail hours must be increased to the pre-riot level. This will enable the inmates to prepare pleadings and briefs necessary in lawsuits. In the viewpoint of the Court, this right has been unconstitutionally restricted since the riot. Again it should be emphasized that, under *Bounds*, access [59] to the courts in this

56. *See Feeley v. Sampson*, 570 F.2d 364 (CA 1, 1977); *Fitzgerald v. Procunier*, 393 F.Supp. 335 (ND Cal, 1975).

57. The Court went on to state: "We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution." 452 U.S. 337, 348, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59.

58. 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

59. *See Glover v. Johnson*, 478 F.Supp. 1075, 1095–1098. *See also Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).

respect is critical. This order will protect plaintiffs' access rights.

The final MBP issue that will be decided involves the post-riot prohibition against group religious services. Plaintiffs assert that the prohibition violates the First Amendment's free exercise of religion clause.

In the recent cases of *Jihaad v. O'Brien*[60] and *Weaver v. Jago*,[61] the Sixth Circuit has spoken about the issue of prisoner religious freedom indicating that the prisoner's asserted right would have to be balanced against the needs of the institution. Other courts, some of which were cited in *Jihaad*, assert that the state religious restrictions must serve a substantial government interest by a reasonable means.[62]

Given that there is a substantial interest in tightening post-riot security at MBP, it still does not follow that the total ban on group services is a reasonable means of effectuating the increased security objective. The total ban is a much too intrusive means to pass this First Amendment test.

■ It follows, therefore, that the total ban of group religious activities is violative of the First Amendment. The total ban simply is not a balancing.

On the other hand, the Court need not order MBP to resume its pre-riot group religious activities schedule. Instead, MBP is allowed to devise a rotating attendance procedure with respect to group services. While MBP is given considerable discretion in devising a plan, the Court nevertheless must lay down the requirement that each resident be granted at least half as much group service time as before the riot. By this approach, MBP can develop a constitutionally acceptable plan and at the same time further the safety and security interest.

■ The Court has thus found that the current MBP procedures are violative of the Eighth Amendment with respect to yard

time, the naked walk to the showers and the group prayer restriction. The remainder of the conditions at the prison complained of either do not violate the Constitution or have been dealt with in the procedural due process section of this opinion. Obviously, the Court has not struck down many of the measures that reduce the level of privileges from pre-riot times. This may seem unfair to plaintiffs since the Court has found that the guard union played a part in causing the riot. On the other hand, the Court also has found that some of the prisoners were at fault by reacting so violently to the guards' provocation. But the net effect as far as this Court's decision goes is probably less than plaintiffs had hoped for, but that is because the Court has no general equitable power to rectify oppressive prison conditions. And since many of the new MBP measures do not fall below the *Rhodes* standards, these measures must withstand plaintiffs' Eighth Amendment attack.

### (b) SPSM Claims

### (b–1) Central Complex

Plaintiffs' claim that meal procedures at Central Complex violate the Eighth Amendment has been analyzed. Incorporated herein by reference are the factual findings on this issue previously stated. The Court concludes that the meal procedures at Central Complex are basically similar to the MBP meal procedures. Accordingly, the earlier discussion of the Eighth Amendment's application to these meal procedures requires a holding that the post-riot meal procedures at SPSM do not violate the Eighth Amendment.

The Court has analyzed plaintiffs' claims in regard to Central Complex yard time and incorporates by reference its earlier discussion of the constitutionality of drastic yard time restrictions. For the reasons set out in the earlier discussion, it is now held that the Central Complex yard time restrictions are

---

**60.** *Jihaad v. O'Brien*, # 79–1104 (CA 6, 1981).

**61.** *Weaver v. Jago*, 675 F.2d 116 (CA 6, 1982).

**62.** *See e.g., Teterud v. Burns*, 522 F.2d 357 (CA 8, 1975); *Moskowitz v. Wilkinson*, 432 F.Supp. 947 (DC Conn, 1977); *Monroe v. Bombard*, 422 F.Supp. 211 (SD NY, 1976).

severe enough to violate the Eighth Amendment. Therefore, the following changes in yard time allotment are ordered: General population inmates in 3, 4, 5, 7 and 8 Blocks are to be allowed at least two hours per day of yard time. Administrative segregation inmates are to be allowed one half hour of yard time per week, thus bringing the Central Complex administrative segregation yard time to its post-riot level. It may be noted that this ruling results in less yard time for Central Complex administrative segregation inmates than MBP administrative segregation inmates. Due to the differences in circumstances between the two prisons, the disparate yard time allotment is justified.

Inmates in 11 and 12 Blocks currently are allotted four hours per day of base yard time. It is ORDERED that the prison is to allow at least two of these hours to be spent as outside yard time. It should, of course, be noted that the prison is not required to increase total yard time over the present level of four hours per day.

The Court incorporates by reference its factual findings regarding the curtailment of sports in the yard of Central Complex. For the reasons set out in the Court's earlier discussion of yard time facilities, the Court concludes that the curtailment of sports and sports facilities is not violative of the Eighth Amendment.

The Court incorporates by reference its factual findings regarding visitation privileges at Central Complex. For the reasons set out in the Court's earlier discussion of yard time facilities, the Court concludes that the visitation allotment is not violative of the Eighth Amendment.

The Court incorporates by reference its fact findings as to shower allotment at Central Complex. The Court also refers to its discussion of the *Rhodes* emphasis on sanitation. In light of this, the Court cannot avoid ordering that non-administrative segregation inmates in Central Complex be allowed to take three showers per week where such showers are not a forced substitute for yard time. Furthermore, the Court ORDERS that the shower allotment for administrative segregation inmates be returned to the one shower per week allotment as in pre-riot times.

The Court incorporates by reference its factual findings regarding the reduction in library access and jailhouse lawyers access in Central Complex. The Court also incorporates its earlier discussion of the law regarding this issue and based thereon concludes that Central Complex has not met the constitutional minimum with respect to access to the courts.

It is ORDERED that the library privileges be restored to the pre-riot level. It is noted that the prison is not precluded from allotting privileges on a staggered basis nor imposing other measures to protect safety and order in connection with the law library. Nevertheless, the pre-riot time allotment must be restored.

The Court incorporates by reference its findings regarding religious services at Central Complex. The Court also incorporates by reference its earlier discussion of First Amendment prison-related law and based thereon concludes that the prison must modify its post-riot religious restrictions to the extent that the inmates are allowed at least one hour per week of group religious activities in addition to the hour-long weekend service. This will allow the prison to advance its security interest, while at the same time, the hardship suffered by inmates will be reduced.

The Court incorporates by reference its findings on the reduced work assignments at Central Complex and its earlier discussion of the law regarding reduced work assignments. For the reasons set out in the earlier discussion, the Court concludes that the reduced work assignments are violative of the Eighth Amendment.

(b–2) Northside Complex

The Court incorporates by reference its findings on the meal procedures utilized at Northside Complex, and applying the standard already discussed, concludes that the Northside Meal Procedures are not violative of the Eighth Amendment.

The Court incorporates by reference its findings as to Northside Complex yard time. For the reasons set out in its earlier discussion of law, the Court concludes that Northside Complex yard restrictions must be modified in order to conform to Eighth Amendment standards. Accordingly, the Court hereby orders the prison authorities to allow unassigned inmates a total of two hours of yard time per day. The Court holds however, that the current denial of the "base yard" option may continue. The prison authorities are also ORDERED to maintain the present thirty minutes per day yard time allotment with respect to assigned inmates. With respect to the withdrawal of weight lifting and horseshoes, the Court, for reasons stated earlier, holds that the withdrawal is not violative of the Eighth Amendment.

The Court incorporates by reference its factual findings on the issue of shower allotments at Northside Complex. The Court again notes that *Rhodes* expresses concern about sanitation deficiencies. Indeed, the denial of adequate shower facilities is a clear example of wanton punishment in that it exposes the inmates to filth and poor health for no penological purpose. Under *Rhodes*, this is impermissible.[63]

The Court holds that post-riot Northside shower procedures are below the minimum constitutional level; therefore, it is hereby ORDERED that both assigned and unassigned inmates be allowed at least three showers per week. These showers must be scheduled such that an inmate is not compelled to sacrifice yard time in favor of a shower. Furthermore, the prison must take steps to assure that showers will not be cancelled or shortened due to defective shower equipment of lack of hot water.

■ The Court incorporates by reference its factual findings on the issue of Northside visitation rights. For the reasons stated in the Court's earlier discussion of law on this topic, the Court concludes that the revised visitation schedule is not violative of the Eighth Amendment.

The Court incorporates by reference its factual findings on the issue of post-riot religious restrictions at Northside Complex. The Court also incorporates by reference its discussion of First Amendment law in the context of inmate religious restrictions and based on its earlier discussion of law, concludes that the post-riot cutbacks on religious activities is not violative of the First Amendment. Muslim inmates still may participate in three hours per week of religious services. The Court finds that the elimination of four hours per week of religious activities is a reasonable means of furthering the objective of increased safety in the wake of the riots.

■ The Court also finds that the reduction in members of the Warden's Forum and the elimination of drama workshop and music activities are without constitutional significance. Such activities are not required by the Constitution. Furthermore, the psychological harm engendered by the denial of such activities is not nearly severe enough to invoke Eighth Amendment protections.

The Court incorporates by reference its factual findings in the reduction of law library time. Certainly, the prison is not required to extend the twelve- to fifteen-hour per week of law library access that certain inmates enjoyed prior to the riot. On the other hand, the Court must remain vigilant in protecting the *Bounds* rights of Northside inmates. In this respect, the Court notes that certain inmates have been allowed up to four and one half hours of library access per week since the riot. Apparently, prison safety is not jeopardized by this allotment. Thus, the remaining penological justification for the cutback is that of pure punishment.

The Court acknowledges that it may well be necessary and appropriate to punish Northside inmates for the damage and destruction caused in the riots. But such punishment must be monitored closely where it impinges upon genuine constitutional rights. Here, the Court finds that the

---

**63.** *See* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981).

*Bounds* rights of Northside inmates have been abridged since the riot. Therefore, the Court orders that Northside inmates be allowed a minimum of four and one half hours per week of law library time. As with Central Complex, the law library periods may be staggered or otherwise regulated in order to assure prison safety. The four and one half hours per week time allotment, however, must not be compromised.

(b–3) Trusty Division

The Court has reviewed its factual findings with respect to Trusty Division and concludes that the post-riot restrictions have not violated any constitutional rights of Trusty inmates. Therefore, the Court will not order any injunctive relief for said inmates.

(b–4) Summary of Non Procedural Due Process Holdings as to SPSM

The Court has found that the post-riot conditions at Central Complex are unconstitutional with respect to yard time, law library access and religious services. The Court has found that the post-riot conditions at Northside Complex are unconstitutional with respect to yard time, showers and law library access. The Court has ordered the prison to take specific steps to meet the constitutional minimum with respect to these areas of prison life. The Court, however, has determined that remaining aspects of prison life at SPSM are not violative of the Constitution.

(c) Michigan Reformatory Claims

The Court incorporates by reference its factual findings as to meal procedures at Michigan Reformatory and for reasons stated earlier in this opinion, finds that the post-riot meal procedures are not violative of the Eighth Amendment.

The Court incorporates by reference its factual findings as to yard time and also its earlier discussion of law with respect to the yard-time issue. For the reasons stated earlier, the Court holds that the post-riot yard time allotments do not meet the mini-

mum standards under the Eighth Amendment. Therefore, it is ORDERED that assigned inmates at Michigan Reformatory be allowed one hour per day of yard time. It is also ORDERED that unassigned inmates at the Reformatory be allowed twenty minutes per day yard time. For the reasons stated earlier, the Court finds that the elimination of baseball and weightlifting does not work a violation of the Eighth Amendment.

The Court incorporates by reference its factual findings as to the post-riot restrictions in religious activities of Muslims and concludes finds that the cutbacks implemented at the prison are too severe to withstand Eighth Amendment scrutiny. Therefore, the Court ORDERS the prison to restore the pre-riot religious services enjoyed by Muslim inmates. On the other hand, the Court will not order the prison authorities to restore radio service privileges or to restore the practice of allowing an Imam to conduct religious services. Restrictions as to these activities are appropriate under a reasonable First Amendment balancing of interests.

The Court incorporates by reference its factual findings as to law library privileges and jailhouse lawyer privileges. Incorporated also by reference is the earlier discussion of law as to this issue. On the basis of this discussion, the Court holds that the post-riot restrictions are violative of the equal protection clause as interpreted in *Bounds* and *Johnson v. Avery.*

In order to remedy those violations, the Court hereby ORDERS the Reformatory to restore library time to the pre-riot level. Furthermore, the Reformatory is ORDERED to cease and desist from screening legal material circulated between inmates and jailhouse lawyers.

The Court incorporates by reference its findings on the issue of job restrictions. For the reasons discussed in the legal discussion of this topic, the Court holds that the job restrictions are not violative of the Eighth Amendment.

In summary, the Court finds that Michigan Reformatory is not meeting minimum constitutional standards as to yard time, certain aspects of religious activities and law library access. Therefore, the Reformatory must carry out the remedial steps ordered above.

## IV CONCLUSION AND ORDER

Having recited its factual findings and conclusions of law, the Court hereby enters judgment for plaintiffs to the extent that defendants are hereby ordered to implement the following measures:

Where an inmate at Marquette Branch Prison, State Prison of Southern Michigan, or the Michigan Reformatory is assigned to administrative segregation in punishment for a major misconduct violation, the inmate must (first), be accorded a hearing on the issue of whether the inmate committed said violation and be supplied at least twenty-four hours prior to the hearing, with a written notice of the hearing and a description of the factual basis of the charges; (second), be allowed to call witnesses and produce documentary evidence unless it reasonably appears that it would be increasingly dangerous to institutional safety to allow the inmate to so prevail; (third), be provided with a written statement setting out the reasons behind the decision to impose administrative segregation.

Where an inmate is assigned to "green card" status at Marquette Branch Prison, the inmate must be entitled to the three-step hearing procedure outlined above. Furthermore, where an inmate is assigned to green card status, said status must be reviewed monthly by a procedure similar to the monthly administrative segregation reviews now held pursuant to Michigan Department of Corrections Rule R.791.4405.

Defendant Warden Koehler of Marquette Branch Prison is further ORDERED to (first), provide general population inmates with two hours of yard time per day; (second), provide administrative segregation and green card inmates with no less than thirty to forty minutes per day of yard time; (third), cease and desist the practice of requiring inmates to walk naked from their cells to the shower facilities; (fourth), restore law library privileges to the level prior to the occurrence of the May 26, 1981 riot; (fifth), devise and put into effect a program by which group religious services are carried on no less than half as often and as long as the group religious services occurring at Marquette Branch Prison prior to the May 26, 1981 riot.

Defendant Warden Mintzes (or his successor) of the State Prison of Southern Michigan is further ORDERED to (first), provide no less than two hours per day of yard time to general population inmates in Central Complex Cell Blocks 3, 4, 5, 7 and 8, and no less than one half hour per week of yard time for Central Complex administrative segregation inmates; (second), provide at least two hours of outdoor yard time to Central Complex inmates in Cell Blocks 11 and 12, said two hours need not be an alternative to the present five hours of base yard time; (third), provide non-administrative segregation Central Complex inmates with three showers per week where such showers are not to be taken as a substitute for yard time; (fourth), restore Central Complex law library privileges to the level prior to the riot; (fifth), provide at least one hour per week of group religious services to Central Complex inmates; (sixth), provide at least two hours per day of yard time to unassigned Northside Complex inmates, and thirty minutes per day of yard time to assigned Northside inmates; (seventh), provide at least three showers per week to both assigned and unassigned inmates at Northside Complex and further take steps to assure that the shower facilities utilized by Northside Complex inmates are not defective or otherwise inadequate or inoperative; (eighth), allow Northside Complex inmates the option of no less than four and one half hours per week of library time.

Defendant Warden Foltz (or his successor) of Michigan Reformatory is further ORDERED to (first), provide assigned inmates with no less than one hour per day of yard time; (second), provide unassigned in-

mates with no less than twenty minutes per day of yard time; (third), provide Muslim inmates with the same time allotments of religious privileges as before the May 22, 1981 riot; (fourth), restore law library privileges to the pre-riot level.

Defendants are allowed forty days from the date of this order to comply with the various provisions and to provide the Court with evidence of compliance.

Defendants are further ORDERED to take reasonable steps to prevent any threats or acts of intimidation or reprisal against plaintiffs or any inmate for the purpose of punishing plaintiffs for bringing this lawsuit or participation in any way in its preparation or presentation or in order to prevent plaintiffs from enjoying their lawful rights as determined by this Court.

IT IS SO ORDERED.